

IN THE COURT OF CRIMINAL APPEALS
OF TEXAS

NO. PD-1438-06

BRYAN KEITH WATKINS, Appellant

v.

THE STATE OF TEXAS

ON APPELLANT'S PETITION FOR DISCRETIONARY REVIEW
FROM THE FIFTH COURT OF APPEALS
DALLAS COUNTY

PRICE, J., delivered the opinion of the Court in which MEYERS, WOMACK, JOHNSON, KEASLER, HERVEY, HOLCOMB and COCHRAN, JJ., joined. KELLER, P.J., filed a concurring opinion.

O P I N I O N

After a jury trial, the appellant was convicted of the offense of burglary of a habitation, and his punishment was assessed by the jury at a term of twenty years in the penitentiary. On direct appeal the appellant claimed, *inter alia*, that the State exercised a number of its peremptory challenges to remove African-American panelists on account of their race. In an unpublished opinion, the Dallas Court of Appeals held that the trial court's ruling that the

appellant failed to establish purposeful discrimination was not clearly erroneous.[1]  In his petition for discretionary review, the appellant complains that the court of appeals conducted an inadequate analysis of his claim in light of the opinion of the United States Supreme Court in *Miller-El v. Dretke*,[2] and that it ignored many of the arguments presented in his brief explaining how the record establishes purposeful discrimination.  We granted the appellant's petition in order to address these contentions.[3]

## THE LEGAL STANDARD

### 1.  At Trial

Since the Supreme Court's opinion in *Batson v. Kentucky*,[4] a criminal defendant has been able to demonstrate that the State has engaged in purposeful discrimination in the exercise of its peremptory challenges "by relying solely on the facts concerning [jury] selection *in his case*."[5]  Proof of systematic exclusion of minority jurors over the course an extended period of time is no longer required.  The defendant must demonstrate, by a preponderance of the evidence, that the prosecutor indulged in purposeful discrimination

---

[1]

*Watkins v. State*, No. 05-05-00568-CR (Tex. App.—Dallas, delivered May 16, 2006).

[2]

545 U.S. 231 (2005).

[3]

*See* TEX. R. APP. P. 66.3(c).

[4]

476 U.S. 79 (1986).

[5]

*Id*. at 95 (emphasis in the original).

against a member of a constitutionally protected class in exercising his peremptory challenges.[6] As the process has been described by the Supreme Court:

> Under our *Batson* jurisprudence, once the opponent of a peremptory challenge has made out a prima facie case of racial discrimination (step one), the burden of production shifts to the proponent of the strike to come forward with a race-neutral explanation (step two). If a race-neutral explanation is tendered, the trial court must then decide (step three) whether the opponent of the strike has proved purposeful racial discrimination.[7]

At the second step of this process, the proponent of the strike need only tender an explanation that is race neutral on its face.[8] The ultimate plausibility of that race-neutral explanation is to be considered as part of the third step of the analysis, in which the trial court determines whether the opponent of the strike (usually the defendant) has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's purposeful discrimination.[9] Whether the opponent satisfies his

---

[6] *Guzman v. State*, 85 S.W.3d 242, 255 & n.48 (Tex. Crim. App. 2002); *Tompkins v. State*, 774 S.W.2d 195, 202 (Tex. Crim. App. 1987); George E. Dix & Robert O. Dawson, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 35.115 (2d ed.), at 536-37 ("Ultimately, the trial court must decide whether the *Batson* claimant has shown by a preponderance of the evidence that a strike was exercised for an unacceptable reason. * * * The claim must be proved by a preponderance of the evidence.").

[7] *Purkett v. Elem*, 514 U.S. 765, 767 (1995); *Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999).

[8] *Purkett v. Elem*, *supra*, at 767-68.

[9] *Id*. at 768 ("It is not until the *third* step that the persuasiveness of the justification [for the peremptory strike] becomes relevant—the step in which the trial court determines whether the opponent of the strike has carried his burden of proving purposeful discrimination.").

burden of persuasion to show that the proponent's facially race-neutral explanation for his strike is pre-textual, not genuine, is a question of fact for the trial court to resolve in the first instance.[10]

## 2. On Appeal

Once the opponent of the challenged strike raises a question of purposeful discrimination, if the trial court then proceeds immediately to the second step by inquiring of the proponent whether he had a non-discriminatory purpose, a reviewing court is to assume that the opponent has satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only the second and third steps.[11] The reviewing court should not overturn the trial court's resolution of the *Batson* issue unless it determines that the trial court's ruling was clearly erroneous.[12] In assaying the record for clear error, *vel non*, the reviewing court should consider the entire record of voir dire; it need not limit itself to arguments or considerations that the parties specifically called to the trial court's attention so

---

[10]

*Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) ("The term 'pretext' is solely a question of fact; there is no issue of law. Therefore, the trial court was in the best position to make that credibility determination.").

[11]

*Hernandez v. New York*, 500 U.S. 352, 359 (1991); Dix & Dawson, *supra*, § 35.113, at 528 ("When the trial court . . . goes directly to a *Batson* hearing on neutral reasons without making a finding on the prima facie question, the question whether a prima facie case has been made becomes moot if a full *Batson* hearing was conducted by the trial court.").

[12]

*Gibson v. State*, *supra*, at 534; *Herron v. State*, 86 S.W.2d 621, 630 (Tex. Crim. App. 2002); *Whitsey v. State*, 796 S.W.2d 707 (Tex. Crim. App. 1990) (Opinion on State's motion for rehearing).

long as those arguments or considerations are manifestly grounded in the appellate record.[13]

But a reviewing court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous.[14]

### 3. *Miller-El v. Dretke*

But, as the Supreme Court has illustrated in its opinion in *Miller-El v. Dretke*, "[d]eference does not by definition preclude relief."[15]  Because Miller-El raised his *Batson* claim in the context of a federal application for writ of habeas corpus, the standard he was required to meet was rigorous indeed.[16]  The Supreme Court nevertheless held that Miller-El met that demanding standard.

The Supreme Court considered the combined impact of a number of factors in

---

[13]

*Young v. State*, 826 S.W.2d 141 (Tex. Crim. App. 1991); *Vargas v. State*, 838 S.W.2d 552, 556 (Tex. Crim. App. 1992).  *Cf. Miller-El v. Dretke*, *supra*, at 241 n.2 (in context of federal habeas corpus review under 28 U.S.C. § 2254, federal court could consider entirety of appellate record with respect to voir dire and make comparative-juror analysis in determining plausibility of prosecutor's race-neutral explanations, though state court was apparently never specifically asked to make comparative-juror analysis during *Batson* hearing).

[14]

*Gibson v. State*, *supra*, at 534.

[15]

545 U.S. at 240, *quoting Miller-El v. Cockrell*, 537 U.S. 322, 340 (2003).

[16]

*Id*. ("Under the Antiterrorism and Effective Death Penalty Act of 1996, Miller-El may obtain relief only by showing the Texas conclusion to be 'an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.'  *28 U.S.C. § 2254(d)(2)*.  Thus we presume the Texas court's factual findings to be sound unless Miller-El rebuts the 'presumption of correctness by clear and convincing evidence.'  *§ 2254(e)(1)*.").

concluding that, by clear and convincing evidence, the prosecutors exercised two peremptory challenges on a racially discriminatory basis, notwithstanding the race-neutral explanations they offered at the *Batson* hearing.[17]  Those factors included:

- that the State exercised its peremptory challenges to eliminate a far greater proportion of the African-American veniremen than the non-African-American veniremen;[18]

- that the reasons the State asserted for eliminating the two African-American veniremen in question appeared to apply equally well to many of the non-African-American veniremen whom the State did not challenge;[19]

- that the State utilized its option to shuffle the jury panels in a manner that supported an inference of race discrimination;[20]

- that the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, in a manner that suggested an intent to single out African-American veniremen for elimination;[21] and

---

[17]

*Id*. at 266 ("The state court's conclusion that the prosecutors' strikes [of two African-American veniremen] were not racially determined is shown up as wrong to a clear and convincing degree; the state court's conclusion was unreasonable as well as erroneous.").

[18]

*Id*. at 240-41.

[19]

*Id*. at 241-52.  The Supreme Court also clarified that reviewing courts must take the proponent of a peremptory challenge at his word when he identifies a race-neutral explanation for his challenge.  If that explanation proves circumstantially suspect, the reviewing court is not to supply some other plausible, race-neutral basis for the challenge.  "If the stated reason does not hold up, its pretextual significance does not fade because a trial judge, or an appeals court, can imagine a reason that might not have been shown up as false."  *Id*. at 252.

[20]

*Id*. at 253-55.

[21]

*Id*. at 255-63.

- that the particular county in which Miller-El was prosecuted had followed a formal policy to exclude minorities from jury service, as evidenced by a training manual that was still in circulation at the time of Miller-El's trial and was known to at least one of the prosecutors at his trial.[22]

Viewing the collective and cumulative impact of these non-exclusive factors,[23] the Supreme Court observed that "its direction is too powerful to conclude anything but discrimination."[24] So powerful was the inference of racial discrimination, the Supreme Court concluded, that it overcame even the heavy deference that federal courts must otherwise pay to state court judgments under the Antiterrorism and Effective Death Penalty Act.

In his petition for discretionary review, the appellant contends that, as in *Miller-El*, the cumulation of all the relevant considerations demonstrates that the trial court's failure to recognize that two of the African-American veniremen on his panel were struck on the basis of their race was clearly erroneous. He argues that the court of appeals did not even address all of the circumstances he identified in his appellate brief in support of this conclusion. We agree that the court of appeals failed to address all of the factors relevant to the determination whether the prosecutor's explanations were pretextual and purposeful discrimination occurred. But when we take all of those factors into consideration, we hold that the court of

---

[22]

*Id*. at 263-64.

[23]

We identified other potentially relevant factors in *Keeton v. State*, 749 S.W.2d 861, 868 (Tex. Crim. App. 1988). *See also* Dix & Dawson, *supra*, § 35.128, at 549-50.

[24]

*Miller-El v. Dretke*, *supra*, at 265.

appeals did not err in finding that the trial court's determination—that no discrimination occurred—was not clearly erroneous. Consequently, we will affirm.

### THE VOIR DIRE

According to the appellant, the court of appeals erred in failing to hold that two African-American veniremen were struck by the State on the basis of their race: Pamela Berry and Leonardine Davis. The court of appeals found that there was no need to inquire whether the appellant had made out a prima facie case because the State had proceeded directly to explain its peremptory strikes.[25] The court of appeals then rejected the appellant's comparative juror analysis. Even if some of the non-African-American veniremen gave similar answers to those that the State asserted as the bases for its peremptory challenges against African-Americans, the court of appeals reasoned, such apparently disparate treatment does not "automatically" impugn the prosecutor's race-neutral explanation.[26] The court of appeals found the appellant's reliance upon *Miller-El* to be unavailing because that opinion simply "reaffirms prior case law that prohibits disparate treatment among jurors and does not announce any new elements or criteria for determining a *Batson* claim."[27]

---

[25] *Watkins v. State*, *supra* (slip op. at 2 n.1).

[26] *Id*. (slip op. at 3) ("Disparate treatment is not automatically imputed to every situation where one of the State's reasons for striking a venire member also technically applies to another venire member whom the State did not strike. *Adanandus v. State*, 866 S.W.2d 210, 224-25 (Tex. Crim. App. 1993).").

[27] *Id*. (slip op. at 5 n.5).

The appellant now complains both that the court of appeals's comparative juror analysis was flawed and that, in any event, the court of appeals failed even to address other relevant components of the pretext analysis that were broached in his appellate brief. Beyond a comparative juror argument, the appellant also argued on appeal that:

- the State used its peremptory challenges at a disproportionate rate to strike African-American veniremen;

- the State directed questions designed to set up peremptory challenges at a disproportionate rate to African-American veniremen;

- the trial court actually found that one of the African-American veniremen had been struck in violation of *Batson*, suggesting that all of the other disproportionate strikes were likewise the result of purposeful discrimination; and

- a study conducted by the Dallas Morning News has demonstrated that a pattern of racially motivated peremptory challenges persists in Dallas County.

In the analysis that follows, we will address each of these arguments in turn.

## 1. Race-Neutral Explanations

At the *Batson* hearing, the State explained that it had exercised a peremptory challenge against prospective juror number 13, Pamela Berry, because "in addressing the State she said that she had a lot of trouble being able to give a life sentence. She would need overwhelming facts to be able to reach that." The appellant did not dispute the State's representation during the *Batson* hearing. We do not find any portion of the State's voir dire that clearly indicates that Berry made any such statement. However, the record does reflect that an unidentified female prospective juror on the first row volunteered to the prosecutor she would "have to

hear the right facts" before she could assess a life sentence. The trial court found the State's explanation to be race neutral. Even if the prosecutor was mistaken or exaggerating about what Berry told him during voir dire, "this is not equal to proving that the reason given [for the peremptory challenge] was a pretext for a racially motivated strike."[28]

As for prospective juror Leonardine Davis, the prosecutor explained that she was peremptorily challenged because, before she was rehabilitated, she indicated that she would hold the State to a higher burden than proof beyond a reasonable doubt, especially before she could assess a life sentence. The record bears out this explanation, and the trial court found it, too, to be race neutral. The trial court did not clearly err to find that the State satisfied its step-two burden of production to tender explanations for its peremptory strikes that are race neutral on their face. We next turn to step three of the analysis and examine the plausibility of the State's race-neutral explanations.

## 2. Disproportionate Strikes

As the court of appeals noted,[29] the record of this non-capital voir dire does not always reveal with crystal clarity everything that was going on. For example, we do not know the names of every member of the jury panel, nor do we have a complete list of the order in which they sat on the panel. The appellant had to supplement the appellate record to make it reveal those veniremen who were ultimately selected for the jury. However, counsel for the

---

[28] *Ford v. State*, *supra*, at 694.

[29] *Id*. (slip op. at 3).

appellant did identify for the record which of the prospective jurors were African-American, without objection or correction by the State. We are able to infer sufficient data from the record to draw the following conclusions.

Both sides exercised ten peremptory challenges, as per the statute,[30] plus one extra peremptory challenge for one alternate juror. Each side independently exercised a peremptory challenge against prospective juror number 28, Nancy Pond. Thus, twenty-one prospective jurors in all were peremptorily challenged.[31] The last juror peremptorily challenged was prospective juror number 37, an African-American named Epps who was struck by the State. Of those first thirty-seven prospective jurors, a total of eight were African-American, according to defense counsel's representation on the record, which the State did not dispute. Of those eight African-Americans, the State peremptorily challenged seven. The eighth, prospective juror Cremena Thompson, apparently served as the alternate on the jury. The appellant himself is an African-American.

Thus, of the first thirty-seven prospective jurors–those who were "in range" to be chosen as jurors or as the alternate juror–22% (or eight divided by thirty-seven) were African-

---

[30] *See* TEX. CODE CRIM. PROC. art. 35.15(b).

[31] The record also indicates that two veniremen, Ms. Box and Ms. Roegstra, were apparently challenged for cause. We cannot tell for sure whether they were seated close to the front of the jury panel. If they were, and assuming that the State could not count on the fact that there might be "double strikes," or prospective jurors that both the State and the defense would strike independently, then as of the time at which they exercised their peremptory challenges, the parties could assume that there would be a total of thirty-seven prospective jurors "in range"–that is to say, who could conceivably be chosen for the jury after the exercise of challenges for cause.

American.[32] A random selection would be expected to yield 2 or 3 (or 22% of 12 total jurors, plus one alternate) African-Americans on the appellant's jury. Instead, only one (8% of 12 total jurors, plus one alternate) was originally selected. Moreover, the State used 55% of its peremptory challenges (six of eleven) to exclude 88% (seven of eight) of the African-Americans from the prospective jury pool. Clearly, the State used a disproportionate number of its peremptory challenges (55% of its challenges against an identifiable racial group that made up only 22% of the venire that was "in range") to exclude almost all of the African-American veniremen from jury service in appellant's case.

This disproportionate use of peremptory challenges would obviously serve to establish a prima facie case for purposeful discrimination,[33] were one required on the facts of this case. Beyond that, it also serves to support the appellant's ultimate burden of persuasion that the State's proffered race-neutral explanations are a sham. But this factor does not alone establish that the trial court's conclusion, that the State's explanations were not pretextual, is clearly erroneous. In *Miller-El*, it was the combined weight of all the factors suggesting pretext that ultimately convinced the Supreme Court that the deference ordinarily accorded to the state court's judgment was inappropriate. Similarly, a reviewing court should look to all relevant factors in deciding whether the trial court's finding was clearly erroneous.

---

[32] All percentages are rounded up to the next integer, *i.e.,* 21.621621 . . .% (eight out of thirty-seven) is rounded up to 22%.

[33] *Linscomb v. State*, 829 S.W.2d 164, 166 (Tex. Crim. App. 1992).

### 3. **Disparate Questioning**

In the course of his voir dire of the panel, the prosecutor discussed three main topics. First he wanted to know which of the prospective jurors had been victims of a burglary. He did not single out any particular juror during this inquiry, but simply asked the veniremen to volunteer that information. Several non-African-American veniremen spoke out.

Next the prosecutor began to educate the jury about the difference between direct and circumstantial evidence. This was obviously an important topic to the State, which hoped to convict the appellant largely on the basis of fingerprint evidence found at the scene of the burglary. Once the prosecutor educated the jury on the difference, he asked whether any prospective juror might "have a problem with circumstantial evidence." Rather than seek volunteers as before, however, the prosecutor began to single out particular veniremen to address this question to. The first two veniremen he singled out in this way were two African-Americans who were apparently sitting next to each other, Julia Harris and John Anderson. He then singled out three non-African-American veniremen to question about their ability to convict based upon circumstantial evidence alone. Two out of the next three prospective jurors he singled out to ask this question were African-Americans, Leonardine Davis and Latonya Jones. After singling out one more non-African-American venireman to question about this topic, the prosecutor asked for volunteers from the remainder of the panel of anyone who might have a problem with circumstantial evidence.

Thus, 45% (four of nine) of those whom the State singled out for questioning about

their ability to convict based upon circumstantial evidence were African-American, even though only 22% (eight out of thirty-seven) of the veniremen who ultimately proved to be in range for selection on the jury were African-American. This means that the prosecutor singled out African-Americans for questioning on this topic at approximately twice the rate that one would expect from a random selection. The prosecutor did eventually quit singling out veniremen altogether, instead asking for volunteers, even though at least two prospective African-American jurors, Ingram and Epps, remained in range.[34]

The third main topic the prosecutor discussed with the jury panel was range of punishment. He wanted to know whether any of the veniremen would have difficulty assessing a life sentence for a burglary. At first he singled out fourteen veniremen who were obviously on the first two rows. None of them was African-American. After that he once again addressed the question globally to the remainder of the panel, and only then did one of the African-American veniremen, Epps, volunteer that, upon reflection, he would have no trouble assessing a life sentence.[35] It is patently obvious that the prosecutor did not intend

---

[34] It is possible to explain the prosecutor's failure to single out Ingram and Epps in terms that remain consistent with a conclusion of discriminatory intent. Both Ingram and Epps had already told the trial court that they could not consider assessing a life sentence in a burglary case. Although Epps would later retract this statement, the prosecutor may have believed he did not need to question Ingram or Epps about circumstantial evidence because he already had a plausible basis for a peremptory challenge against them. Indeed, he would later explain at the *Batson* hearing that he had peremptorily struck both Ingram and Epps because of their reluctance to assess a life sentence.

[35] Epps had originally responded to questioning from the trial court to the effect that he could *not* assess a life sentence in a burglary case. *See* note 34, *ante*.

that this third line of questioning should serve to manufacture a pretext for excluding prospective African-American jurors via peremptory challenges.

In summary, while one of the prosecutor's main lines of questioning seemed suspiciously directed toward African-Americans, the two others manifestly were not. Again, although there is some evidence here that would support a finding that the prosecutor's explanations were pretextual, the trial court found no pretext. Nor can we say that this evidence, at least by itself, compels a conclusion that the trial court clearly erred.

### 4. Comparative Juror Analysis

The State peremptorily challenged Pamela Berry because she would be unable to assess a life sentence unless she heard "the right facts." The State also exercised peremptory challenges against two non-African-American veniremen, Elizabeth Shinn and Mariamma Thomas, on the basis of their hesitation to assess a life sentence in a burglary case. It appears that the State also successfully challenged another non-African-American venireman, a Ms. Box, for cause on the basis that she could not assess a life sentence. The only other prospective juror who expressed any reservation about assessing a life sentence was Arnulfo Favela, a non-African-American who was not challenged by either party, and who served on the jury. We are unable to say on this state of the record that Berry was struck on a basis that did not apply equally to most of the non-African-American veniremen.

Nor was venireman Leonardine Davis peremptorily struck for a reason that applied equally to non-African-Americans. In response to the prosecutor's questioning with respect

to circumstantial evidence, a number of non-African-American veniremen who were not struck had initially expressed some reservations about relying upon circumstantial evidence to convict. But only Davis stated that the prosecutor's circumstantial evidence would have to convince her of a defendant's guilt "without a doubt." The prosecutor was essentially able to coach Davis on the difference between all doubt and reasonable doubt, and Davis eventually acknowledged that she could convict on the basis of circumstantial evidence that persuaded her to a level of confidence *beyond a reasonable doubt*. Still, Davis was the only venireman during the course of this line of questioning who ever spontaneously suggested that she might hold the State to a level of confidence greater than beyond a reasonable doubt. For this reason she stood apart from those non-African-American veniremen who expressed some initial hesitation about convicting on the basis of circumstantial evidence alone, but who were eventually rehabilitated. For these reasons, we agree with the court of appeals that a comparative-juror analysis yields no evidence of pretext.

### 5. Venireman Jones

During the *Batson* colloquy, the trial court actually found that one of the State's peremptory challenges, against prospective juror Latonya Jones, was impermissible, and retroactively placed her on the jury. The appellant argues that this finding constitutes a compelling basis for concluding that the peremptory challenges the State exercised against Berry and Davis were likewise pretextual. As we view the record, however, it is unclear that the trial court did in fact find that the State's race-neutral explanation for its strike against

Jones was pretextual. The trial court might have found, instead, that the State's explanation was not race-neutral on its face. If that is the case, it would lend less weight to the argument that the State's explanations of its peremptory challenges of the other African-American veniremen, which the trial court found to be race neutral, were a sham.

Jones was prospective juror number 25. The prosecutor asked a number of veniremen whether they could convict on the basis of circumstantial evidence. Jones assured him that she could. Later when the appellant's counsel questioned her, Jones revealed that she was a housewife who used to work as a data entry operator. Then the following exchange occurred:

[Appellant's Counsel]:    And have you been on a jury before?

[Jones]:    Yes.

[Appellant's Counsel]:    And what kind of case was that?

[Jones]:    Domestic violence.

[Appellant's Counsel]:    Assault?

[Jones]:    Yes.

[Appellant's Counsel]:    Did you reach a verdict in that case?

[Jones]:    Yes.

[Appellant's Counsel]:    And was the jury selected to assess punishment?

[Jones]:    No.

[Appellant's Counsel]:    And were you the Foreperson?

[Jones]:        No.

[Appellant's Counsel]:        Anything about that that would prevent you being fair in this case?

[Jones]:        No.

Appellant's counsel then moved on to question another venireman.

During the brief *Batson* hearing, the State explained that it had exercised a peremptory challenge against Jones because she "was a member of a jury who voted not guilty in a domestic violence assault case."[36] Later in the hearing the trial court returned to the subject of prospective juror Jones:

THE COURT:        And again, on No. 25, Latonya Jones?

[The State]:   Judge, she was a jury member on a domestic violence assault case in which she found the person charged not guilty.

THE COURT:        Well, that's as thin as it gets. I mean, we all know that Class A domestic violence case not guilty could have been any number of reasons why. And if you went back and pulled her card and the State had a lockdown for sure guilty case and, you know, you could bring me something I could hold onto. But just because she followed the law and the evidence that she believed you can't exclude someone for finding a not guilty previously. So your objection to juror No. 25, Latonya Jones, is sustained. I shall seat her.

[The State]:   Judge, we believe that just for the record that that is a race neutral reason and she was, in fact, the only member in the strike

---

[36]

    Jones's voir dire did not indicate that she had voted not guilty in the domestic-violence case. Because we do not have juror cards or questionnaires before us, we cannot tell whether the prosecutor may have gleaned this fact (assuming it is factual) from some other source.

zone to serve on a jury and to also find someone not guilty.

     THE COURT:     Well, that's, at this point, not going to get there.

From this point the trial court immediately went on to explain that the State's asserted reason for peremptorily challenging another prospective juror, Davis, *was* race neutral.

It is difficult to say for certain on this record whether the trial court rejected the State's asserted explanation for striking Jones because it was not race neutral, or because the asserted race-neutral explanation was a pretext. If the former, the trial court plainly erred, because a prospective juror's willingness to vote to acquit an accused in a domestic-violence prosecution bears no relation to her race. Perhaps (although this seems less likely to us in context) the trial court rejected the State's asserted explanation as so insubstantial and implausible a reason to exercise a peremptory challenge as to amount to a pretext. But prosecutors frequently exercise peremptory challenges to eliminate potential jurors who have acquitted criminal defendants in the past. That Jones may have voted to acquit a defendant in a relatively minor classification of offense does not seem to us to make the State's race-neutral explanation significantly less plausible.

On balance, we agree with the appellant that the trial court's action in placing Jones back on the jury is a circumstance that cuts in favor of a conclusion that the prosecutor's other peremptory challenges were race-based. But, given the colloquy above, we do not think it necessarily compels that conclusion, even in combination with other factors that support an argument of pretext. We regard it as a circumstance that weighs tenuously in the appellant's

favor, to be factored into the totality of circumstances in deciding whether the trial court clearly erred in failing to find that prospective jurors Berry and Davis were excluded on account of their race.

### 6. The Dallas Morning News Study

The appellant urges us to consider the results of a study commissioned by the Dallas Morning News that he contends shows a continuing pattern on Dallas County's part of exercising peremptory challenges in a racially discriminatory manner. The court of appeals refused to consider this study, which was not presented at trial, but proffered for the first time in the appellant's brief on direct appeal.[37] The appellant contends that the court of appeals should have taken judicial notice of this study. We disagree.

Whether Dallas County persists in discriminatory practices in the exercise of its peremptory challenges is unquestionably, in the context of a *Batson* hearing, a question of adjudicative fact. Judicial notice of adjudicative facts is governed by Rule 201 of the Texas Rules of Evidence.[38] Under Rule 201(d), a trial court is required to take judicial notice "if requested by a party and supplied with the necessary information." Moreover, under Rule 201(f), "[j]udicial notice may be taken at any stage of the proceeding." Professors Goode, Wellborn and Sharlot have maintained that, consistent with these provisions of Rule 201, the question of whether an appellate court should take judicial notice of an adjudicative fact when

---

[37] *Watkins v. State*, *supra* (slip op. at 6 n.5).

[38] TEX. R. EVID. 201.

the underlying data or materials in support of that notice are presented for the first time in that court should be a matter of the appellate court's discretion, never mandatory.[39]

We do not think the court of appeals abused its discretion in refusing to judicially notice the Dallas Morning News study on appeal. To do so would have put the State at a distinct disadvantage in our adversarial system, because (if for no other reason than) the State would have been given no opportunity to challenge the integrity or provenance of the study, as it could have done had the study been presented for judicial notice at the *Batson* hearing. The appellant asserts that the study is subject to judicial notice on appeal because "it is based on sound scientific statistical principles that are capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned."[40] But he does not identify those sources, much less explain why their accuracy is beyond reproach.

Judicial notice on appeal should be taken, if at all, "where necessary to avoid an unjust judgment."[41] Because he has not adequately established the indisputability of the Dallas Morning News study, the appellant has not demonstrated that judicial notice on appeal was

---

[39] Steven Goode, Olin Guy Wellborn III & M. Michael Sharlot, 1 TEXAS PRACTICE: GUIDE TO THE TEXAS RULES OF EVIDENCE § 201.7 (3d ed. 2002), at 75.

[40] Appellant's Brief in Support of Petition for Discretionary Review, at 35, *citing Mata v. State*, 46 S.W.3d 902 (Tex. Crim. App. 2002). *See* TEX. R. EVID. 201(b) ("**Kinds of Facts.** A judicially noticed fact must be one not subject to reasonable dispute in that it is . . . (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.").

[41] Goode, Wellborn & Sharlot, *supra*, *citing Sparkman v. Maxwell*, 519 S.W.2d 852, 855 (Tex. 1975).

necessary to avoid an unjust judgment. We cannot say the court of appeals abused its discretion not to consider the Dallas Morning News study in gauging whether the trial court clearly erred to deny the appellant's *Batson* claim.

**CONCLUSION**

This case presents a closer question than the court of appeals acknowledged in its analysis. As we have demonstrated, there was evidence in the record from which a rational judge could have concluded that the State's race-neutral explanations for its peremptory challenges against Berry and Davis were but a pretext for race-based exclusion. The numbers support the appellant. The State exercised its peremptory challenges against African-American veniremen at a grossly disproportionate rate as compared to non-African-Americans. This fact serves not only to establish the appellant's prima facie case of racial discrimination (if that were needed in this case), but also as evidence in support of his ultimate burden of persuasion. Moreover, the prosecutor directed at least one line of questioning designed to ferret out objectionable jurors toward African-American veniremen at twice the rate one would expect from random selection. The trial court may (or may not) have found that the prosecutor's motive in peremptorily striking another African-American prospective juror was racial. These facts militate in favor of a finding of pretext, and would have supported a trial court's ruling to that effect.

But this is not a case, like *Miller-El*, in which *every* relevant factor firmly supports a conclusion of pretext. The prosecutor's explanations for why he peremptorily struck Berry

and Davis were manifestly race-neutral. It was the appellant's ultimate burden to persuade the trial court that those explanations were incredible or disingenuous. The State struck other, non-African-American veniremen for the same reason that it struck Berry. And it is apparent that Davis was struck because she gave an answer that was different from, and more objectionable to the State than, the answers it received from non-African-Americans to the same line of questioning. Thus, the record also supports a conclusion that the State's race-neutral explanations were not a pretext.

In *Miller-El v. Dretke*, the Supreme Court treated the question of pretext as a question of fact.[42] We also regard it as a fact question, for the trial court to resolve, subject to reversal on appeal only for clear error.[43] Because the record supports the trial court's resolution of this fact question, we cannot say that it clearly erred, even though the record might support an opposite resolution as well. Accordingly, we affirm the judgment of the court of appeals.

Delivered:    February 13, 2008
Publish

---

[42]

545 U.S. at 240 ("This case comes to us on review of a denial of habeas relief sought under *28 U.S.C. § 2254*, following the Texas trial court's prior determination of fact that the State's race-neutral explanations were true[.]").

[43]

*Gibson v. State*, *supra*, at 534.