

**In The
Court of Appeals
Sixth Appellate District of Texas at Texarkana**

_____

No. 06-11-00073-CR

_____

RAY CHARLES HAWKINS, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 114th Judicial District Court
Smith County, Texas
Trial Court No. 4-93-821

Before Morriss, C.J., Carter and Moseley, JJ.
Memorandum Opinion by Chief Justice Morriss

MEMORANDUM OPINION

During jury selection in Ray Charles Hawkins' Smith County[1] trial for indecency with a child, Hawkins' counsel made two *Batson*[2] challenges, both of which were overruled by the trial court and which are the basis for Hawkins' appeal. Hawkins was ultimately convicted and sentenced to twenty years' incarceration.[3] We affirm the judgment of the trial court, because (1) the State proffered manifestly race-neutral explanations for its strikes, and (2) the trial court did not clearly err in accepting those explanations.

Hawkins' *Batson* challenges questioned the State's peremptory strikes of two African-American veniremembers.[4] The trial court, without expressly finding Hawkins established a prima facie showing of racial discrimination, heard testimony from the State regarding its use of peremptory strikes on the two African-American veniremembers. At the conclusion of the hearing, the trial court overruled the *Batson* challenges, finding the State

---

[1]Originally appealed to the Twelfth Court of Appeals, this case was transferred to this Court by the Texas Supreme Court pursuant to its docket equalization efforts. *See* TEX. GOV'T CODE ANN. § 73.001 (West 2005). We are unaware of any conflict between precedent of the Twelfth Court of Appeals and that of this Court on any relevant issue. *See* TEX. R. APP. P. 41.3.

[2]*See Batson v. Kentucky*, 476 U.S. 79 (1986).

[3]The alleged offense occurred in 1992, and Hawkins was initially convicted of indecency with a child and sentenced to twenty years' imprisonment in 1993. After Hawkins' initial appeal was dismissed as not timely filed, he was granted an out-of-time appeal. That appeal was likewise dismissed due to a lack of certification of right to appeal. After Hawkins was granted a second out-of-time appeal, the Court of Appeals for the Twelfth District reversed the judgment of the trial court and remanded to the trial court for a new trial. This trial resulted in the judgment from which Hawkins now appeals.

[4]Hawkins challenged the State's peremptory strikes on juror numbers twenty and twenty-four.

expressed race-neutral reasons for the exercises of its peremptory strikes. On appeal, Hawkins contends the State's reasons for the exercise of the peremptory strikes were a pretext for discrimination.

The State's purposeful use of peremptory strikes in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution. *Batson*, 476 U.S. at 89. The United States Supreme Court has outlined a three-step process for evaluating claims that the State has exercised peremptory challenges in a manner violating the Equal Protection Clause. *Hernandez v. New York*, 500 U.S. 352, 358 (1991); *Batson*, 476 U.S. at 96–98. The defendant must first make a prima facie showing that the State has exercised peremptory challenges on the basis of race. *Hernandez*, 500 U.S. at 358. When this showing is made, the burden then shifts to the State to articulate a race-neutral explanation for striking the juror in question. *Id.* at 358–59; *see also Miller-El v. Cockrell*, 537 U.S. 322, 328 (2003). In light of this information, the trial court must then determine whether the defendant has shown purposeful discrimination. *Miller-El*, 537 U.S. at 328–29.

We should review a *Batson* claim

by an examination of the record in the light most favorable to the ruling of the trial court. The standard of review is whether the ruling of the trial court was or was not "clearly erroneous." If supported by the record, including the voir dire, the prosecutor's explanation of his use of a peremptory challenge, the rebuttal by appellant and impeaching evidence, the decision of the trial court will not be clearly erroneous.

3

*Camacho v. State*, 864 S.W.2d 524, 528 (Tex. Crim. App. 1993) (citations omitted). To determine whether the trial court's ruling was clearly erroneous, we examine the record to determine whether the ruling leaves us with a "definite and firm conviction that a mistake has been committed." *Guzman v. State*, 85 S.W.3d 242, 254 (Tex. Crim. App. 2002). The trial court's decision on the issue of pretext is solely a question of fact. *Gibson v. State*, 144 S.W.2d 530, 534 (Tex. Crim. App. 2004). The trial court is therefore in the best position to make that credibility determination. *Id.*

> The trial court's ruling in the third step must be sustained on appeal unless it is clearly erroneous. Because the trial court's ruling requires an evaluation of the credibility and demeanor of prosecutors and venire members, and because this evaluation lies peculiarly within the trial court's province, we defer to the trial court in the absence of exceptional circumstances.

*Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010) (citations omitted).

*(1)     The State Proffered Manifestly Race-Neutral Explanations for Its Strikes*

The first of the two veniremembers—who were struck by the State and whose removal has been challenged by Hawkins—was Vickie Washington. Counsel for the State testified that Washington was struck from the panel because "she felt some discomfort with racism involving police in Smith County," and believed some police officers acted on racism in Smith County. The State's attorney further testified that Washington was struck because, though listed as a possible witness in an indecency-with-a-child case, she failed to raise her hand when asked on voir dire whether she had knowledge of any similar cases. In addition, Washington hesitated to answer the

4

State's question regarding law enforcement and prejudice during the State's voir dire:

> With regard to Number 20, as a parole officer, she was very hesitant and very concerned about the race, and she wouldn't even -- she hesitated to answer my question.[5]

> I even commented upon that, because there -- there is a concern that they are affected by it in a way that would be adverse to my position before I even get a shot to do it.

In denying the *Batson* challenge to Washington, the trial court found

> [T]hat the State has expressed race-neutral reasons, specifically the hesitance to answer, her lack of forthrightness, her -- the tendency of a parole officer to be geared toward rehabilitation rather than punishment, which is often what the State

---

[5]This testimony concerns the following exchange between Washington and counsel for the State:

[STATE]: Is there any problem, from a racial standpoint, with the police -- or any – any kind of law enforcement in the Smith County area?

WASHINGTON: Well, I don't know how to answer it.

[STATE]: It's a hard question.

WASHINGTON: It's very hard.

[STATE]: Yes.

WASHINGTON: Because you see a whole lot of different things.

[STATE]: Yes, ma'am, you do.

WASHINGTON: A lot.

    . . . .

[STATE]: . . . And you hesitated, see, and you -- you know, it's like the longer you hesitate, the more I realize you have some discomfort about that; fair to say?

WASHINGTON: Yes, it is.

is looking for, and then really her lack of a square answer with regard to the prejudice question.

The Court does find those are race-neutral reasons and denies the challenge under *Batson* as to Juror Number 20.

The State articulated race-neutral reasons for striking Washington. *See Purkett v. Elem*, 514 U.S. 765, 768 (1995) (unless discriminatory intent inherent in prosecutor's explanation, offered reason deemed race neutral); *see also Williams v. State*, 301 S.W.3d 675, 689 (Tex. Crim. App. 2009) (veniremember "never would quite answer the question"). Striking a potential juror for being hesitant in answering questions during voir dire is a valid, race-neutral explanation. *See Kennerson v. State*, 984 S.W.2d 705, 708 (Tex. App.—Houston [1st Dist.] 1998, pet. ref'd).

The proponent of the strike need only tender a facially race-neutral reason for the strike. The ultimate plausibility of that explanation is to be considered as part of the third step, in which the court determines whether the opponent of the strike has satisfied the burden of persuasion to establish by a preponderance of the evidence that the strike was the product of the proponent's purposeful discrimination. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008).

Here, Hawkins claims the State's explanation of concern about Washington's views of Smith County law enforcement as prejudiced or racist is merely a pretext for discrimination. This concern, Hawkins maintains, could have easily been resolved by further questioning of Washington, and the failure to do so exposes the weakness of the State's explanation. *See Chambers v. State*, 866 S.W.2d 9, 24–25 (Tex. Crim. App. 1993) (lack of questioning might

6

expose weakness of State's explanation). Even so, "the State is not required to ask a specified rubric of questions." *Id*. at 24.

The State suspected that Washington would not be a good juror because she hesitated in responding to questions, expressed concerns regarding prejudice by law enforcement, demonstrated a lack of candor, and, because she was a parole officer, she might be geared toward rehabilitation rather than punishment. Under these circumstances, Hawkins has failed to demonstrate that the State's explanation of Washington's hesitancy in responding to questions and concern about race did not constitute manifestly race-neutral explanations for striking Washington. Hawkins also has not attempted to demonstrate how the State's concern regarding a lack of candor[6] and Washington's employment as a parole officer[7] are not race-neutral explanations for striking Washington. *See Middleton v. State*, 187 S.W.3d 134, 142 (Tex.

---

[6]Counsel for Hawkins testified that Washington did not disclose her previous service as a witness in an unrelated indecency trial when asked during voir dire:

> Anybody worried about the time or anybody on this side that either was a victim or knows a victim of some kind of sexual crime? Put it that way.

> Either a close family member or a close personal friend, anybody that has any of that in their background?

[7]During the State's voir dire, Washington indicated that she worked as a parole officer for almost ten years. One of the State's explanations for striking Washington was based on her employment. Counsel stated,

> We also talked about the parole officer and the corrections officer. We look -- I personally look at those, no matter what their color, very closely all the time because of experiences I've had throughout my career with people who begin to -- to identify, and, in fact, some even begin to associate with the people that [they] are supervising, and we concern ourselves with that.

7

App.—Texarkana 2006, no pet.) (veniremember's employment is race-neutral explanation, if State has had poor success with that type worker). The State provided race-neutral explanations for its peremptory strike against Washington, none of which were indicative of purposeful discrimination.

The second veniremember in question was Ralph Thompson. Counsel for the State testified that Thompson was struck because he had been previously convicted for assault and driving while intoxicated. The State further indicated Thompson was struck because he believed Smith County law enforcement was prejudiced.[8] In overruling Hawkins' *Batson* challenge, the

---

[8]The exchange with Thompson (veniremember number twenty-four) prompting the peremptory challenge follows:

> [STATE]: Have you ever had a bad experience with a police officer?
>
> THOMPSON: Getting stopped for no reason.
>
> . . . .
>
> [STATE]: Is there anything about those experiences that would cause you a problem with a police officer around here?
>
> THOMPSON: No.
>
> . . . .
>
> [STATE]: Give me an assessment. Police officers in Smith County, general assessment, good or bad?
>
> THOMPSON: Good.
>
> [STATE]: They do their -- they do their jobs and do them well?
>
> THOMPSON: Yes, sir.
>
> [STATE]: Okay. Just because of that, are you going to automatically believe them?

trial court found Thompson's prior convictions (although Thompson was not asked about them) to be a race-neutral reason for the exercise of the peremptory strike. *See Partida v. State*, 133 S.W.3d 738, 742 (Tex. App.—Corpus Christi 2003, no pet.) (criminal history is race-neutral reason for striking from panel).

The questioning of Thompson failed to indicate, however, that Thompson believed Smith County law enforcement was prejudiced—one of the reasons given by the State for the exercise of a peremptory challenge against Thompson. To the contrary, Thompson's responses reflected his belief that Smith County law enforcement officers are "good" and do their jobs well. While this isolated explanation is factually inaccurate, the State provided a verifiable, race-neutral explanation for its use of a peremptory strike against Thompson, and the trial court overruled Hawkins' *Batson* challenge based solely on the race-neutral explanation, as described in the preceding paragraph of this opinion. The trial court, thus, did not err in finding the State satisfied its burden of production to provide race-neutral explanations for its peremptory strikes. We next turn to step three of the analysis and examine the plausibility of those race-neutral explanations.

*(2)    The Trial Court Did Not Clearly Err in Accepting the State's Race-Neutral Explanations for Its Strikes*

Hawkins asserts that prejudice in the exercise of the State's peremptory challenges is

| THOMPSON: | No. |
| [STATE]: | Are you going to automatically disbelieve them? |
| THOMPSON: | No. |

9

evidenced by the line of questioning regarding the issue of racism and prejudice. Initially, Washington was questioned regarding her views on the issue of whether Smith County law enforcement was racially prejudiced. Immediately after Washington was questioned on this issue, the State turned to Thompson, who claimed no problem in that area.[9] Next, the State questioned veniremember thirty-one (an African-American later struck for cause) regarding his views on race relations and law enforcement.[10] The State then questioned veniremember thirty-eight, the only remaining African-American in the strike zone,[11] and asked the same types of questions.[12]

Hawkins complains that the State struck two of the three remaining African-Americans in the strike zone (the fourth having been struck for cause). Moreover, the only persons the State questioned regarding racism or prejudice were the African-American members of the panel.[13] Essentially, Hawkins claims the State used its peremptory challenges at a disproportionate rate to

---

[9]When asked if he perceived any problem "with the law enforcement people of Smith County with regard to racial issues," Thompson replied that he perceived no such problem.

[10]This veniremember indicated he believes there is some degree of racial prejudice in Smith County law enforcement.

[11]The trial court noted for the record that those African-American veniremembers within the strike zone were numbers twenty, twenty-four, thirty-one, and thirty-eight. There was one additional African-American on the panel, outside the strike zone.

[12]Veniremember thirty-eight indicated he believes Smith County law enforcement engages in racial stereotyping.

[13]Counsel for the State testified that, after reviewing his voir dire notes, he did not believe other veniremembers were asked about racism in Smith County. Our review of the record reveals that only the four African-American veniremembers in the strike zone were asked about prejudice or racism in Smith County law enforcement.

strike African-American veniremembers[14] and further directed questions designed to set up peremptory challenges at a disproportionate rate to African-American veniremembers.

Certainly, this strategy by the State—questioning only minority veniremembers on whether they viewed Smith County law enforcement as prejudiced—is certain to raise eyebrows and put the State in a vulnerable position in trying to defend against this *Batson* challenge. The trial court could have justifiably found a pretext based on this selective questioning, given the situation presented. But it did not so find. Our job is not to rule based on what we would have found, had we been in the trial court's position, but to determine whether the trial court's ruling was clearly erroneous. *Grant*, 325 S.W.3d at 657.

Similar concerns were addressed in *Watkins v. State*, 245 S.W.3d 444 (Tex. Crim. App. 2008). In that case, of the first thirty-seven veniremembers, eight were African-American. The State used six of its eleven peremptory challenges to exclude seven of the eight African-Americans from the jury pool. *Id.* at 451. Faced with disproportionate use of peremptory challenges, the court recognized:

> [T]his factor [the disproportionate use of peremptory challenges] does not alone establish that the trial court's conclusion, that the State's explanations were not pretextual, is clearly erroneous. In *Miller-El*,[15] it was the combined weight of all

---

[14]Although the record does not reflect the number of strikes utilized on veniremembers other than African-Americans, we presume, based on Hawkins' argument and the State's response, that the remainder of the State's strikes was used on non-African-American veniremembers.

[15]The *Miller-El* factors included (1) the use of peremptory challenges to eliminate a far greater proportion of African-American veniremembers than non-African-American veniremembers, (2) the reasons asserted for eliminating two African-American veniremembers appeared to apply equally well to many of the non-African-American veniremembers who were not challenged, (3) utilization by the State of the option to shuffle

the factors suggesting pretext that ultimately convinced the Supreme Court that the deference ordinarily accorded to the state court's judgment was inappropriate. Similarly, a reviewing court should look to all relevant factors in deciding whether the trial court's finding was clearly erroneous.

*Id.* at 452.

*Watkins* also involved the issue of disparate questioning. The State questioned African-American veniremembers about their ability to convict based on circumstantial evidence at twice the rate one would expect from a random selection. *Id.* The court concluded, however, that, while one of the State's main lines of questioning "seemed suspiciously directed toward African-Americans, the two others manifestly were not." *Id.* at 453. While disparate questioning was some evidence "that would support a finding that the prosecutor's explanations were pretextual, the trial court found no pretext. Nor can we say that this evidence, at least by itself, compels a conclusion that the trial court clearly erred." *Id.*

Here, the State's questioning of only African-American veniremembers about their opinion of racial prejudice among Smith County law enforcement—which one might suppose is predominantly Caucasion—is evidence the State directed questions designed to set up peremptory challenges at a disproportionate rate to African-American veniremembers. As in *Watkins*, the State's remaining areas of questioning were not "suspiciously directed toward

the jury panel in a manner that supported an inference of race discrimination, (4) utilization of questioning specifically designed to elicit grounds for peremptory challenges disproportionately, in a manner that suggested an intent to single out African-American veniremembers for elimination, and (5) that the county in which *Miller-El* was prosecuted followed a formal policy to exclude minorities from jury service. *Miller-El v. Dretke*, 545 U.S. 231, 240–63 (2005). The cumulative impact of these none-exclusive factors caused the United States Supreme Court to conclude that "its direction is too powerful to conclude anything but discrimination." *Id.* at 265.

12

African-Americans."[16]

The State's use of peremptory challenges against two of the three remaining African-Americans in the strike zone is disproportionate.

But, neither of these factors, standing alone, can support the conclusion that the trial court erroneously determined that the State's explanations for the exercise of its peremptory challenges were not pretextual. *Id.* at 451, 453. The question becomes, then, one of whether these two factors, when combined, compel the conclusion that the trial court erred in finding a lack of pretext for the State's race-neutral explanations for its peremptory challenges to Washington and Thompson. We conclude they do not.

In *Watkins*, the court acknowledged "there was evidence in the record from which a rational judge could have concluded that the State's race-neutral explanations for peremptory challenges . . . were but a pretext for race-based exclusion."[17] *Id.* at 456. The court recognized,

---

[16]The State engaged in five primary lines of questioning, including judging the credibility of witnesses, the panel's experience with law enforcement, the length of time between the offense and trial, whether the veniremembers have been or know someone who has been a crime victim, and the State's burden of proof in general and in light of certain categories of evidence. In questioning the panel regarding its experiences with law enforcement, the State turned to the issue of racism and prejudice. Only veniremembers twenty, twenty-four, thirty-one, and thirty-eight (all African-American) were called on individually for their assessment of prejudice in Smith County law enforcement.

[17]The court elaborated:

> The numbers support the appellant. The State exercised its peremptory challenges against African–American veniremen at a grossly disproportionate rate as compared to non-African-Americans. This fact serves not only to establish the appellant's prima facie case of racial discrimination (if that were needed in this case), but also as evidence in support of his ultimate burden of persuasion. Moreover, the prosecutor directed at least one line of questioning designed to ferret out objectionable jurors toward African–American veniremen at twice the rate one would expect from random selection. The trial court may (or may not) have found that the prosecutor's

13

however, that

> this is not a case, like *Miller–El*, in which *every* relevant factor firmly supports a conclusion of pretext. The prosecutor's explanations for why he peremptorily struck Berry and Davis were manifestly race-neutral. It was the appellant's ultimate burden to persuade the trial court that those explanations were incredible or disingenuous. The State struck other, non-African-American veniremen for the same reason that it struck Berry. And it is apparent that Davis was struck because she gave an answer that was different from, and more objectionable to the State than, the answers it received from non-African-Americans to the same line of questioning. Thus, the record also supports a conclusion that the State's race-neutral explanations were not a pretext.

*Id.* at 457. Further,

> In *Miller–El v. Dretke*, the Supreme Court treated the question of pretext as a question of fact. We also regard it as a fact question, for the trial court to resolve, subject to reversal on appeal only for clear error. Because the record supports the trial court's resolution of this fact question, we cannot say that it clearly erred, even though the record might support an opposite resolution as well.

*Id.* (citations omitted).

In this case, as in *Watkins*, the State provided manifestly race-neutral explanations for its use of peremptory strikes against Washington and Thompson. It was Hawkins' burden to persuade the trial court that those explanations were "incredible or disingenuous." *See id.* Hawkins does not argue, and did not present evidence at the *Batson* hearing, that the State engaged in disparate treatment by failing to strike similarly situated white veniremembers with criminal

---

motive in peremptorily striking another African–American prospective juror was racial. These facts militate in favor of a finding of pretext, and would have supported a trial court's ruling to that effect.

*Id.* at 456–57.

14

histories, who expressed hesitancy in answering questions, who were employed as parole officers, or who had previously served as a witness (or possible witness) at a criminal trial involving a similar type of offense. And, while it is true that some evidence at voir dire could support an inference of pretext, the question of pretext is one of fact. *Id.* Because the record supports the trial court's resolution of this fact question, we cannot say the decision of the trial court is clearly erroneous.

We affirm the judgment of the trial court.

Josh R. Morriss, III
Chief Justice

Date Submitted:     January 10, 2012
Date Decided:       January 25, 2012

Do Not Publish