# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-10-00098-CR

**Margarita Quintella Ramirez, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF TOM GREEN COUNTY, 340TH JUDICIAL DISTRICT NO. C-08-1153-SB, HONORABLE BEN WOODWARD, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found Margarita Quintella Ramirez guilty of murder and assessed her punishment at thirty years in prison. *See* Tex. Penal Code Ann. § 19.02(b)(1) (West 2003). By her sole issue on appeal, Ramirez contends that the trial court abused its discretion by denying her objection to the seating of the jury. Ramirez argues that the State failed to provide race-neutral reasons for striking Hispanic members of the panel of prospective jurors. *See generally Batson v. Kentucky*, 476 U.S. 79 (1986). We affirm the judgment.

Ramirez and the decedent, Robert Guevara, began dating when she was fifteen years old and he was seventeen. Shortly thereafter, she moved in with him. A year into the relationship, Guevara began physically abusing Ramirez and, on May 18, 2007, inflicted injuries that resulted in her hospitalization. She moved out, but the relationship did not end. They moved back in together,

then separated. Although at the time of Guevara's death, both were dating other people, Guevara had a picture of Ramirez in his car and told Ramirez that she was his until death parted them.

Their relationship was in a fairly volatile phase at the time of Guevara's death. Ramirez had done some favors for Guevara—purchased a car in her name (using his money) because he did not have a driver's license and tried to find what hospital his sister had been taken to following a car accident—and he had thanked her and given her some presents—a compact disc player, speakers, and other accessories for her car. Guevara became upset upon learning that Ramirez was dating another man, however, and demanded that she return the presents and provide him with title to the car. In the days immediately preceding Guevara's death in October 2008, he and Ramirez engaged in a series of text messages and telephone calls regarding these issues and the status of their relationship in which he threatened her several times. Many of theses communications occurred while Ramirez was accompanied by a relatively new friend, Valerie Sepeda.

It is undisputed that a gang of youths led by Sepeda's boyfriend, Mike Mendoza, set out to confront Guevara. The chief issues at trial were the intended nature of the confrontation, Ramirez's role in prompting it, and her knowledge regarding the others' intentions. Ramirez testified that she simply wanted to give Guevara the items he demanded in hopes that he would stop threatening her. She testified that Sepeda told Mendoza and his friends about Guevara's threats and that she knew that Mendoza's group was getting a little "worked up" about the threats. She knew that Mendoza communicated with Guevara and that the communications involved gang issues as well as her safety and honor. She testified that she accepted the offer of Mendoza's group's company because she feared for her safety based on Guevara's conduct. She admitted that she told

2

the group they would find Guevara at the Texas Roadhouse and admitted that, once they arrived at the site, she confirmed for the group Guevara's identity. Sepeda testified, however, that Ramirez asked her to get Mendoza to beat up Guevara and then, as Guevara's threats escalated, that Ramirez vowed to kill Guevara and asked her to get Mendoza to kill Guevara. Ramirez testified that the rifle was carried to the scene in another car, but Sepeda testified that the rifle was in Ramirez's car. Accounts of Ramirez's reaction to the shooting varied. Ramirez testified that she was unaware that Guevara had been hit. Another witness testified that she appeared shocked after the shooting. Sepeda testified, however, that Ramirez taunted Guevara after the shooting. Guevara's girlfriend testified that she heard a voice that sounded like Ramirez make the same taunt.

It is undisputed that Ramirez left the shooting scene with the group, went to a motel with some of the group members, fled when police came, but eventually spoke with police. It is also undisputed that her story evolved during the course of police interviews. Other witnesses testified at trial in ways that added details not present in their statements to police, such as an assertion that Ramirez was seen smirking after the shooting. Ramirez's attorney indicated that these details were added to show cooperation with the State in hopes of getting reduced sentences for co-defendants.

In her appellate brief, Ramirez relies exclusively on her contention that the trial court erred by allowing the State to use its peremptory strikes improperly to exclude Hispanic jury panelists. We will first set out the standard for reviewing the trial court's ruling on a *Batson* challenge to provide a framework for assessing the voir dire proceedings, then review the voir dire proceedings and argument relevant to the contested strikes.

3

**The standards for assertion and review of *Batson* challenges**

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits race-based jury selection. *Batson*, 476 U.S. at 89. It also prohibits exclusion of Hispanics based on their ethnicity. *Hernandez v. New York*, 500 U.S. 352, 355 (1991) (plurality op.). A *Batson* challenge proceeds as follows: (1) the movant makes a prima facie case that a jury panelist was excluded on the basis of race; (2) the nonmovant provides race-neutral reasons for exercising the peremptory challenge; and (3) the movant rebuts those reasons. *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001). The movant has the burden of persuasion. *Id.* The movant must show by a preponderance of the evidence that the nonmovant purposefully discriminated against a member of a constitutionally protected class in exercising his peremptory challenges. *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). The trial court must decide whether the nonmovant's facially neutral reasons given for the peremptory challenge were contrived to conceal an improper discriminatory intent. *Id.*

The Court of Criminal Appeals compiled a non-exclusive list of factors that weigh against the legitimacy of a race-neutral explanation:

1. The reason given for the peremptory challenge is not related to the facts of the case;

2. There was a lack of questioning to the challenged juror or a lack of meaningful questions;

3. Disparate treatment—persons with the same or similar characteristics as the challenged juror were not struck;

4

4. Disparate examination of members of the venire, i.e., questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members; and

5. An explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically.

*Whitsey v. State*, 796 S.W.2d 707, 713-14. (Tex. Crim. App. 1989). The presence of any one of these factors tends to show that the State's reasons are not actually supported by the record or are an impermissible pretext. *Id.* at 713.

A court of appeals can reverse a judgment for a *Batson* violation only when the trial court's ruling on the *Batson* challenge is clearly erroneous. *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004).[1] This highly deferential standard is used because the trial court is in the best position to determine whether a prosecutor's facially race-neutral explanation for a peremptory strike is genuinely race-neutral. *Id.* To conclude that the trial court's decision was clearly erroneous, an appellate court must have a "definite and firm conviction that a mistake has been committed" after reviewing all of the evidence in the light most favorable to the ruling. *Rhoades v. State*, 934 S.W.2d 113, 123-24 (Tex. Crim. App. 1996). Because the trial court conducted a *Batson* hearing, we must presume that Ramirez made a satisfactory prima facie case of purposeful discrimination. *See Watkins*, 245 S.W.3d at 447; *see also Hernandez*, 500 U.S. at 359. The Supreme Court has held that "[t]he second step of the process does not demand an explanation that

---

[1] The Texas Court of Criminal Appeals has adopted the "clearly erroneous" standard of review for *Batson* challenges in criminal cases, while the Texas Supreme Court has adopted an "abuse of discretion" standard for *Batson* challenges in civil cases. *Compare Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) *with Davis v. Fisk Elec. Co.*, 268 S.W.3d 508, 515 (Tex. 2008).

5

is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Instead, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez*, 500 U.S. at 360). The race-neutral explanation does not have to make sense—it just cannot be racially discriminatory. *Id.* at 769 (cited by *Contreras v. State*, 56 S.W.3d 274, 279 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd)). The appellate court must affirm the trial court's decision on the *Batson* challenge unless the ruling is clearly erroneous. *Craig v. State*, 82 S.W.3d 451, 454-55 (Tex. App.—Austin 2002, pet. ref'd).

**Ramirez's contentions**

Ramirez, who is Hispanic, contends that the State purposefully exercised its peremptory strikes to discriminate against Hispanic panelists. She notes that seven Hispanics were among the first 37 panelists after other panelists were struck for cause. Of its eleven peremptory strikes,[2] the State used peremptory strikes against five of the seven panelists with Hispanic surnames in that range—Juana Marquez, Monica Rodriguez, Raymond Torres, Lendall Hernandez, and Jennifer Lopez. Ramirez did not use any of her eleven peremptory strikes on panelists with Hispanic surnames. The jury included one juror and one alternate with Hispanic surnames. Ramirez requested explanations for the State's strikes on the five Hispanic panelists, and argues on appeal that the prosecutor's "stated reasons for striking at least three of the five Hispanics are contrary to

---

[2] Each side initially used ten peremptory strikes, then received and used an additional strike on one of the four potential alternates.

6

the objective circumstances and human reason." The three strikes contested on appeal were used on Marquez, Rodriguez, and Torres.[3]

**The State's explanations for the strikes and Ramirez's rebuttal**

The State said it struck Juana Marquez because "from the very outset of this case, [she] wanted to get out." At the beginning of voir dire, when the trial court asked to hear from panelists who felt they might not be qualified or had an exemption or excuse that would cause them not to serve, Marquez approached the bench and the following exchange occurred between "Juror" Marquez and the court:

JUROR: I don't understand very well English. I barely make citizenship.

THE COURT: Okay. And were you born here or—

JUROR: I born in Mexico.

THE COURT: So you're a naturalized citizen?

JUROR: Pardon me?

THE COURT: You're naturalized, you took an oath?

JUROR: Yes, sir.

THE COURT: And do you read the daily newspaper or something like that?

---

[3] The State also explained why it struck the two panelists whose strikes Ramirez does not directly challenge on appeal. The State said it struck Lendall Hernandez because he was 25 years old, is a drug and alcohol counselor, is single, was somewhat inattentive, and seemed unwell. The State said it struck Hernandez because his youth and occupation might make him more forgiving of youthful mistakes. The State explained that it struck Jennifer Lopez because Lopez "knew the defendant personally, had gone to school with her for at least three years, vacillated extensively during our questioning before the bench. There's no way I'm going to take her on a jury."

JUROR: Yes, sir, I read.

THE COURT: I'm going to have you stay as a juror, and make sure everybody understands, and they can talk to you more about that.

JUROR: Okay. I need to stay?

THE COURT: Yes, please.

JUROR: Okay.

When explaining why Marquez was struck, the prosecutor stated:

> She came up during the initial voir dire and said she did not speak English well, was uncomfortable with this. Seems like she made some statements of the same nature during general voir dire. And, if I'm not mistaken, may have responded once during Mr. Rios's questioning.
>
> I don't want her. We've got so much dependent in this case on listening to testimony, on about four hours worth of taped interviews. For her understanding of the English language, I think, is very important. And, again, at the bench, she started telling us this before we ever started voir dire.
>
> Someone who doesn't want to be on the jury and wants to be out, was of her discomfort, I'm not going to take her if I can strike her at some other point.

The State explained that it struck Monica Rodriguez because she

> was a person who we felt like was rather on the young side, although that's not totally dispositive; she was born in 1977. She and her husband work at something called CA Tech, which I'm not real sure what that is.
>
> She is married, has one child, has a high school diploma, but kind of felt like being the—the husband was unemployed. I remember that was a factor that Mr. Best and I were discussing. This was the last strike we decided to exercise. And with that background of unemployment in the family, some youth, we just felt like there were other jurors we liked better.

8

The prosecutor said the State struck Raymond Torres because the prosecutor knew Torres through working with Torres's wife. The prosecutor stated as follows:

> I don't want to sound—sound bad, but I do know that he is not a terribly educated man. I didn't feel very comfortable with him on a jury being as I knew him and knew of him. I didn't know how he would feel, as far down the [list as] he was. I did not feel he would be the type of gentleman I would want, more personal acquaintance than personal feelings about him.

Ramirez argued that these explanations were not race-neutral. She noted that the State did not ask individual questions of these panelists to explore the State's asserted concerns. For instance, it did not ask Marquez questions about her understanding of English, ask Torres about his education, or ask any questions of Rodriguez. Ramirez argued that the State's uneasiness with Rodriguez's relative youth (she was 32 years old) did not cause the State to strike younger non-Hispanics including Amy Newman (24 years old) and Cody Renfro (29 years old). Ramirez struck Newman, but Renfro served on the jury.

The court overruled the *Batson* motion, stating that its observations of some of the panelists concurred with the State's assertions. The court agreed that Marquez did not speak English very well and stated that, "I'm concerned, having heard at pretrial some of the videotape and the audio, it's going to be hard for somebody to understand. And if they can't understand English very well, it's going to make it that much more difficult." The court stated that Hernandez was inattentive during voir dire.

After the court overruled the *Batson* motion, the State added that it declined to strike Renfro "even though he was a bit on the younger side" because of the assessment of a

9

police detective who said she knew Renfro because he grew up with the detective's daughter. The prosecutor said that the detective opined that Renfro "was a good kid, basketball player, and thought he was very intelligent," attributes which offset his youth in the prosecutor's evaluation.[4]

**Analysis of the trial court's rulings**

The standard of review imposes a heavy burden on Ramirez to show that the trial court clearly erred by denying her *Batson* challenge to the State's peremptory strikes. *See Gibson*, 144 S.W.3d at 534. We note initially that some of the *Whitsey* factors are present with respect to all three disputed strikes and weigh somewhat against the State's argument that the strikes were race-neutral. *See* 796 S.W.2d at 713-14. The reasons given for the disputed peremptory strikes did not generally bear on the facts of the case. Only the age of Rodriguez—which the prosecutor stated was not a totally dispositive factor—relates tangentially to the facts of the case in that the primary actors were teenagers. Further, the State did not specifically question these panelists on the asserted bases for the strikes although, other than with respect to the issue of age, Ramirez did not show that the State had a disparate questioning strategy or treated others differently based on similar responses to individual questioning. The factor relating to group bias is irrelevant to this case because the State did not expressly assert that any group bias motivated its strikes. *See id*.

The appellate record does not demonstrate that the trial court's denial of the *Batson* challenge was clearly erroneous with respect to Marquez. The only indication of Marquez's facility with English on the record is her own assertion, "I don't understand very well English. I barely make

---

[4] The State's failure to strike the even younger Newman was unexplained, although Newman did not serve because the defense struck her.

citizenship." This statement reveals both her self-perception of her ability to understand English and some nonstandard sentence construction that supports her self-perception. Her statement that she reads does not refute her belief that she does not understand English very well because it does not reveal her proficiency in reading or in understanding spoken English—i.e., whether she could understand recorded statements that were somewhat challenging to understand. The prosecutor's asserted concern that Marquez's self-professed limited understanding of English would impair her ability to evaluate a record that contained four hours of recorded testimony was not shown to be inaccurate or racially motivated. The trial court expressly found it credible. Although the linguistic gap may be due to Marquez's birth in a country where English is not the primary language, there is no showing that the strike was due to the fact that Marquez is Hispanic. There is also no support for Ramirez's assertion that the State was "making up the allegation that Ms. Marquez expressed discomfort and wanted off from the start." Marquez did not expressly state that she did not want to be on the jury, but she voluntarily approached the court when the court invited panelists who felt they were not qualified to serve or should be excused or exempted from service to speak. It is not racist to infer that Marquez approached the bench at that time due to discomfort or a desire not to be on the jury. When she was told to stay, her response was "I need to stay?" rather than "I get to stay?" or simple acceptance.[5] Marquez's tone and body language might have revealed something about her state of mind, but tone and body language are not evident from the record before us. The trial court was far better positioned than we are to assess nonverbal aspects of this communication that

---

[5] By contrast, when panelist Xavier Pena was not excused after explaining that his barber was the victim's grandfather, he responded, "Okay. Great. All right. Thanks."

11

might support or refute the assertion that Marquez seemed uncomfortable or desired not to serve. The record before us does not demonstrate that the State's explanation of its strike was motivated by Marquez's ethnicity. The trial court's ruling that the State's peremptory strike of Marquez was race-neutral is not clearly erroneous.

The appellate record does not demonstrate that the trial court's denial of the *Batson* challenge was clearly erroneous with respect to Rodriguez. The State's explanation that it struck her for her relative youth and her husband's unemployment—despite the apparent inconsistency in the State's assertion that her husband worked at CA Tech and that he was unemployed—are facially race-neutral. The State explained its preference against youth when striking a 25-year-old Hispanic panelist, Lendall Hernandez, by opining that his youth (and occupation) might make him more forgiving of youthful mistakes. The State expressly stated when striking Rodriguez, however, that age was "not totally dispositive," and acted consistently with that by failing to strike the 29-year-old non-Hispanic Renfro because he was described favorably by a police detective. There is no showing that the State's expressed preference for older jurors was racially motivated. The State did not explain why suspected unemployment of a spouse makes a panelist less desirable, but the lack of explanation does not prove that it is a pretext intended to conceal racial bias. The State's ultimate explanation that Rodriguez was its final strike and that "we just felt like there were other jurors we liked better" was not shown to be racially motivated. The reason for the strike does not have to make sense, but it must be race-neutral. *Purkett*, 514 U.S. at 769. The trial court's conclusion that the strike of Rodriguez was race-neutral is not clearly erroneous.

12

The appellate record does not demonstrate that the trial court's denial of the *Batson* challenge was clearly erroneous with respect to Torres. The prosecutor's explanation that the State struck Torres because the prosecutor knew Torres and knew him not to be educated is facially race-neutral. Although the State did not explain why education is necessary or helpful in assessing a murder charge, the explanation was not shown to be a pretext for racial bias. Neither is racial animus evident in the State's assertion that, based on personal acquaintance with Torres, the prosecutor did not feel that Torres was the type of juror that the prosecutor wanted. Although the State did not question Torres individually, the prosecutor's personal feelings from his acquaintance with Torres were not likely to be revealed by Torres's answers to the prosecutor's questions. Ramirez has not shown that Torres was treated differently from other panelists about whom the State felt similarly. Although Ramirez has argued that the State's explanations are not clear, consistent, or plausible, after reviewing all of the evidence in the light most favorable to the ruling, we cannot say that she has created a definite and firm conviction that a mistake has been committed. *See Rhoades*, 934 S.W.2d at 123-24. The trial court's conclusion that the explanation for striking Torres was race-neutral was not shown to be clearly erroneous.

**Conclusion**

Concluding that the record does not demonstrate that the trial court's denial of the *Batson* challenges was clearly erroneous, we affirm the judgment.

_____

Diane M. Henson, Justice

Before Chief Justice Jones, Justices Patterson and Henson

Affirmed

Filed:   December 22, 2010

Do Not Publish

14