

## NUMBER 13-10-174-CR

## COURT OF APPEALS

## THIRTEENTH DISTRICT OF TEXAS

## CORPUS CHRISTI - EDINBURG

---

**DAVID LEONARD MCELROY aka,**
**DAVID LENARD MCELROY**                                      **Appellant,**

**v.**

**THE STATE OF TEXAS,**                                        **Appellee.**

---

### On appeal from the Criminal District Court
### of Jefferson County, Texas.

---

## MEMORANDUM OPINION

### Before Justices Garza, Benavides, and Vela
### Memorandum Opinion by Justice Vela

A jury found appellant, David Leonard McElroy aka David Lenard McElroy, guilty of tampering with physical evidence, a third-degree felony. *See* TEX. PENAL CODE ANN. § 37.09(a)(1), (c) (Vernon Supp. 2010). After he pleaded true to an enhancement allegation, the trial court sentenced him to ten years' imprisonment. In three issues,

appellant complains of *Batson* error, and he challenges the legal and factual sufficiency of the evidence to support his conviction.   We affirm.

## I. FACTUAL BACKGROUND

On April 21, 2009, while patrolling the area around an apartment complex in Port Arthur, Texas, Officer Jonathan Green saw a Lexus that was not parked in a designated place in the complex's parking lot.   As he drove towards the Lexus, its headlights came on, and it exited the parking lot, turning right onto 9th Avenue.   Officer Green stopped the Lexus after its driver "turned without signaling."   Officer Green recognized the driver as appellant and saw a towel between his legs on the driver's side floorboard.   When he asked appellant what was under the towel, appellant picked it up, and Officer Green "saw little white-looking rocks fall off the towel, like small little pebbles."   Officer Green believed this rock-like substance was crack cocaine.   He testified that based upon his training and experience as a police officer, he had seen crack cocaine on "[m]any occasions" and said that this "off-white rock substance that fell out of the towel, was . . . consistent, based upon [his] training and experience, to be that of suspected crack cocaine."

After appellant's hands were handcuffed behind his back, he was put into the back seat of Officer Green's patrol car.   Officer Green testified that at that time, appellant did not have anything in his mouth.   Officer Green put the suspected crack cocaine inside an undamaged plastic evidence bag and took appellant and the bag to the police station, where he put appellant and the bag in an "evidence room," leaving the bag on top of a table.   Officer Green left the evidence room for about thirty seconds to find someone to

2

field test the suspected crack cocaine. He testified that when he put the plastic evidence bag on the table, the bag had not been "tampered with in any way" and that the "off-white rock substances was [sic] still inside that plastic bag when [he] left the room[.]" However, he stated that when he returned to the evidence room, "I saw the plastic bag that the suspected crack cocaine was in on top of the table, and it had a hole in it. I saw the defendant sitting down, still handcuffed with his hands behind his back, chewing."

Officer Green was unable to remove the substance from appellant's mouth and stated that appellant's "lips was [sic] very white . . . ." When appellant "passed out," EMS took him to a hospital. After receiving treatment, he was taken to jail. When the prosecutor asked Officer Green, "[B]ased upon your reason and common sense and your training and experience as a police officer, what did you believe happened in that . . . evidence room when you left to go find somebody to do the field test?", he said, "I believe he [appellant] got up, took the evidence off the table, put it in his mouth, and chewed a hole in it to destroy the evidence." Officer Green said that based upon his training and experience as a police officer, he had a "few" opportunities to see someone ingest crack cocaine. When the prosecutor asked him, "And based upon those experiences, were they consistent . . . with having white-colored lips and the way that . . . [the] defendant was responding, was that similar to your experience—as somebody ingesting cocaine?", he said, "Yes, sir." Officer Green did not recover any of the suspected crack cocaine and testified that appellant's conduct "impair[ed] [his] ability or [his] agency's ability to continue in its investigation into the possession of controlled substance charge against [appellant.]" He said that appellant's "actions impaired [his] ability" to test the suspected

3

crack cocaine.

On cross-examination, when defense counsel asked Officer Green, "How could somebody be handcuffed behind their back and maneuver to where they can get that baggy and get it up to their mouth to chew a hole in it?", he said, "[T]he table that it [the bag of suspected crack cocaine] was on is not that high." He testified, "I think he maneuvered himself, got the bag off the table, and chewed a hole in it and ate it." He stated that he could not "be 100 percent positive" that nobody else was in the evidence room with appellant at the time he left to find someone to field test the suspected crack cocaine. He also said there was no video surveillance of the events that occurred in the evidence room and that "[i]t's possible" someone had entered the evidence room after he left. However, he said that nothing he did caused appellant to "pass out." When asked about the "texture" of the "little rocks" found underneath the towel, Officer Green said it "was soft, maybe like dried up mashed potatoes." Even though Officer Green was not sure what the substance was that he recovered from the Lexus, he said it was not "gravel or rocks."

The defense did not call any witnesses to testify at the guilt-innocence phase.

## II. DISCUSSION

### A. Sufficiency of the Evidence

In issue one, appellant argues the evidence is factually insufficient to prove that the substance he allegedly swallowed was cocaine. In issue two, he argues the evidence is legally insufficient to prove that the substance he allegedly swallowed was cocaine. We review his sufficiency complaints under only the standard set out in

*Jackson v. Virginia*, 443 U.S. 307, 319 (1979). S*ee Brooks v. State*, 323 S.W.3d 893, 895 (Tex. Crim. App. 2010) (overruling *Clewis v. State*, 922 S.W.2d 126 (Tex. Crim. App. 1996)).

### 1. Standard of Review

"When conducting a legal sufficiency review, a court must ask whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt'—not whether '*it* believes that the evidence at trial established guilt beyond a reasonable doubt.'" *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009) (quoting *Jackson*, 443 U.S. at 318-19) (emphasis in original). "In doing so, we assess all of the evidence 'in the light most favorable to the prosecution.'" *Id.* (quoting *Jackson*, 443 U.S. at 319). "After giving proper deference to the fact finder's role, we will uphold the verdict unless a rational fact finder must have had reasonable doubt as to any essential element." *Id.* at 518. We must presume that the fact finder resolved any conflicting inferences in favor of the prosecution and defer to that resolution. *Jackson*, 443 U.S. at 326.

### 2. Applicable Law

Our review of a legal sufficiency challenge should be examined under the principles of review for a hypothetically correct jury charge. *Grotti v. State*, 273 S.W.3d 273, 280-81 (Tex. Crim. App. 2008). "'Such a charge [is] one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof, or unnecessarily restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried.'" *Villarreal v. State*,

5

286 S.W.3d 321, 327 (Tex. Crim. App. 2009) (quoting *Malik v. State*, 953 S.W.2d 234, 240 (Tex. Crim. App. 1997)).

Three elements define the crime of tampering with physical evidence: "(1) knowing that an investigation or official proceeding is pending or in progress[;] (2) a person alters, destroys, or conceals any record, document, or thing[;] (3) with intent to impair its verity, legibility, or availability as evidence in the investigation or official proceeding." *Williams v. State*, 270 S.W.3d 140, 142 (Tex. Crim. App. 2008) (citing TEX. PENAL CODE ANN. § 37.09(a)(1)). "The three elements of section 37.09(a)(1) include 'two different culpable mental states'—knowledge and intent." *Id.* (quoting *Stewart v. State*, 240 S.W.3d 872, 874 (Tex. Crim. App. 2007)). "The statute requires the knowledge of an investigation and the intent to impair a thing's availability as evidence." *Id.* The statute envisions "an offender who intends for, but is not necessarily aware of, the impairment of something's role as evidence in the investigation." *Id.* at 244. "A person acts knowingly, or with knowledge, with respect . . . to circumstances surrounding his conduct when he is aware . . . that the circumstances exist." TEX. PENAL CODE ANN. § 6.03(b) (Vernon 2003). In contrast, "[a] person acts intentionally, or with intent, with respect . . . to a result of his conduct when it is his conscious objective or desire to . . . cause the result." *Id.* § 6.03(a).

The indictment alleged, in relevant part, that on the day in question, appellant: "did then and there, knowing that an INVESTIGATION was IN PROGRESS, to-wit: POSSESSION OF A CONTROLLED SUBSTANCE, intentionally and knowingly DESTROYED a ROCK LIKE SUBSTANCE, to-wit: SUSPECTED COCAINE, with intent

6

to impair its availability as evidence in the INVESTIGATION, . . . ." (emphasis in original). Here, the evidence showed: (1) Officer Green had seen cocaine on many occasions; (2) when appellant picked up the towel, Officer Green saw "little white-looking rocks" fall off of it; (3) Officer Green testified that this "off-white rock substance that fell out of the towel," was consistent, based upon his training and experience, to be cocaine; (4) when he returned to the evidence room, the plastic bag that had contained the suspected cocaine had a hole in it; (5) he saw that appellant was "chewing" and that his lips were "very white"; (6) shortly thereafter, appellant passed out, and EMS took him to the hospital; (7) Officer Green had seen people who had ingested cocaine; (8) Officer Green did nothing to appellant that would have caused him to pass out; (9) appellant's conduct impaired the Port Arthur Police Department's ability to continue in its investigation into the possession of controlled substance charge against him; and (10) appellant's actions impaired Officer Green's ability to test the suspected contraband.

Viewing the evidence in the light most favorable to the verdict, a rational jury could have found beyond a reasonable doubt that, knowing an investigation was in progress, appellant destroyed the evidence with the intent to impair its availability as evidence in an investigation that he knew was in progress and that he knew the evidence he swallowed was cocaine. *See Williams*, 270 S.W.3d at 142. Issues one and two are overruled.

## B. *Batson* Challenge

In issue three, appellant argues that the trial court erred in denying his *Batson* challenge to the State's peremptory strikes.

### 1. Standard of Review

In *Batson v. Kentucky*, the United States Supreme Court held that "the Equal Protection Clause forbids the prosecutor to challenge potential jurors solely on account of their race." 476 U.S. 79, 89 (1986). To show that the State has engaged in purposeful discrimination in the exercise of its peremptory challenges, "[t]he defendant must demonstrate, by a preponderance of the evidence, that the prosecutor indulged in purposeful discrimination against a member of a constitutionally protected class in exercising his peremptory challenges." *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008).

A *Batson* challenge to a peremptory strike has three steps. *Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010). First, an opponent of the prosecutor's strike must establish a *prima facie* showing of racial discrimination. *Id.* Second, the proponent of the strike must state a race-neutral explanation for the strike. *Id.* Third, the trial court must decide whether the opponent of the strike has proved purposeful racial discrimination. *Id.*

An appellate court must sustain the trial court's ruling with respect to the third step unless it is clearly erroneous. *Id.*; *see Snyder v. Louisiana*, 552 U.S. 472, 477 (2008). "Because the trial court's ruling requires an evaluation of the credibility and demeanor of prosecutors and venire members, and because this evaluation lies peculiarly within the trial court's province, we defer to the trial court in the absence of exceptional circumstances." *Grant*, 325 S.W.3d at 657; *see also Watkins*, 245 S.W.3d at 448 (stating that "a reviewing court should examine the trial court's conclusion that a facially

8

race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous").

When applying the "clearly erroneous" standard, an appellate court "will not disturb a trial court's ruling unless we are left with a definite and firm conviction that a mistake has been committed." *Rhoades v. State,* 934 S.W.2d 113, 123-24 (Tex. Crim. App. 1996). The Supreme Court has held that "[t]he second step of the process does not demand an explanation that is persuasive, or even plausible." *Purkett v. Elem*, 514 U.S. 765, 768 (1995). Instead, "the issue is the facial validity of the prosecutor's explanation. Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." *Id.* (quoting *Hernandez v. New York,* 500 U.S. 352, 360 (1991) (plurality op.)).

The court of criminal appeals has compiled a non-exclusive list of factors that weigh against the legitimacy of a race-neutral explanation: (1) the reason given for the peremptory challenge is not related to the facts of the case; (2) there was a lack of questioning to the challenged juror or a lack of meaningful questions; (3) disparate treatment—persons with the same or similar characteristics as the challenged juror—were not struck; (4) disparate examination of members of the venire—i.e., questioning a challenged juror so as to evoke a certain response without asking the same question of other panel members; and (5) an explanation based on a group bias where the group trait is not shown to apply to the challenged juror specifically. *Whitsey v. State*, 796 S.W.2d 707, 713-14 (Tex. Crim. App. 1989). In *Grant*, the court of criminal appeals stressed that

9

a trial court could consider the *Whitsey* factors, but these factors should not replace the applicable standard of review. 325 S.W.3d at 659. The court stated that "[t]he overriding standard is still whether the trial judge's decision was supported by the record so that it is not clearly erroneous." *Id.* (quoting *Vargas v. State*, 838 S.W.2d 552, 554 (Tex. Crim. App. 1992)).

Appellant, who is African-American, complains about the State's strikes of venire members Adrian Bell, Justin Horace, Demetria Nettles, Danylle Jackson, Joanna Smith, and Peggy Bowie, all of whom are African-American. Defense counsel represented to the trial court that there were eleven African-American venire members on the panel and that six of the State's ten strikes were exercised against African-Americans. Four African-Americans served on the jury.

### 2. The *Batson* Hearing

### a. Adrian Bell

The prosecutor explained that he struck Bell because "when the Court asked for the . . . potential jury panel to raise their right hand and take the oath, she raised the wrong hand. . . ." In addition, he said that during the course of his voir dire presentation, "it appeared that [Bell] was not following, not paying attention."

### b. Justin Horace

The prosecutor explained that Horace "did not seem to be following my presentation and he seemed disinterested. . . ." The prosecutor further stated that he struck Horace because "I felt like there was not a good rapport established between me and Mr. Horace. . . ."

### c. Demetria Nettles

During voir dire examination, Nettles told defense counsel she worked as a corrections officer for the Texas Youth Commission ("TYC"). When defense counsel asked her if "you're out at the TYC facility and you come across something that you think is contraband, either illegal drugs or something like that[,] [w]hat kind of steps do you take to secure that?", she said, "First of all, I keep my eye on it, on the substance or whatever if may be. If I move, it goes with me." She also stated she would "secure the area" and "secure my evidence." When defense counsel asked her, "You certainly wouldn't let someone that you suspect is responsible for what may be the evidence around it, to have access to it, would you?", she said, "No. . . . I need to keep my eye on it. . . ." She stated she would not allow inmates access to what she thought may be evidence.

At the *Batson* hearing, the prosecutor stated that he wanted "the record to show that according to [Nettles'] information sheet, . . . she does work as a corrections officer and that she discussed in detail certain things about how they handled illegal contraband in a correctional facility." He further stated "[t]hat is extremely similar to the set of circumstances that I have in the case at bar."

### d. Danylle Jackson

The prosecutor stated he struck venire member Jackson "based upon my records of criminal history showing that she had a theft by check back in the year 1998." He noted that the case was dismissed after she paid restitution. He pointed out to the trial court that he had struck two white venire members because one had "an alcohol violation," and the other had "received six months' probation on an unlawfully carrying

11

weapons' charge."

### e. Joanna Smith

During the State's voir dire examination, Smith told the prosecutor that she had twice served on a criminal jury—one case was an assault, and the other was a murder. With respect to the assault case, she told the prosecutor that the jury found the accused in that case "not guilty." Concerning the murder case, she said that it was a hung jury.

At the *Batson* hearing, the prosecutor told the trial court that he struck Smith "because when asked about her prior criminal jury service, she indicated that no punishment was assessed but the jury had found the defendant not guilty."

### f. Peggy Bowie

During the State's voir dire, Bowie told the prosecutor that appellant is her nephew. After the completion of general voir dire, the trial court excused all of the venire members, except for Bowie. When the trial court asked Bowie, "[I]t's my understanding that if you were a juror here in this case, you would just not be able to be fair and impartial because you're related to the defendant?", she said, "Yeah," and said appellant is her brother-in-law's son. Upon questioning by defense counsel, she said she could follow the trial court's instructions and obey the law. She told the trial court she "would be fair," but she also told the court, "I feel sympathetic. So that probably will play a part."

At the *Batson* hearing, the prosecutor stated he struck Bowie because "she is somehow related to the defendant; and I felt that she would be biased, prejudiced against the State of Texas."

At the conclusion of the *Batson* hearing, the trial court overruled defense counsel's *Batson* challenge, stating, in relevant part: "the Court finds that . . . the defense has not met its burden in a prima facie case that the purpose that the prospective jurors were eliminated were the basis of race." The court further stated that even "if there was a prima facie case, then the State has met its burden in providing neutral reasons that are clear and specific that show that there was not intentional discrimination on behalf of voir dire."

## C. Analysis

"We review the record of a *Batson* hearing and the voir dire examination in the light most favorable to the trial court's ruling". *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009). Because the trial court conducted a *Batson* hearing, we must presume appellant made a satisfactory *prima facie* case of purposeful discrimination. *See Watkins*, 245 S.W.3d at 447; *see also Hernandez*, 500 U.S. at 359. The standard of review imposes a heavy burden on appellant to show that the trial court clearly erred by denying his *Batson* challenge to the State's peremptory strikes. *See Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) (stating that a court of appeals can reverse a judgment for a *Batson* violation only when the trial court's ruling on the *Batson* challenge is clearly erroneous). Appellant did not show that the State had a disparate questioning strategy or treated other venire members differently based on similar responses to individual questioning. The factor relating to group bias is irrelevant to this case because the prosecutor did not expressly assert that any group bias motivated his strikes. *See id.* We note that the prosecutor struck Adrian Bell because Bell "was not following, not paying

13

attention" to his voir dire presentation. The prosecutor stated that he struck Justin

Horace because he: (1) seemed disinterested; (2) did not seem to be following his voir

dire presentation; and (3) a good rapport was not established between him and Horace.

Because the prosecutor's reasons for striking Bell and Horace are based upon the

prosecutor's observations, the trial court is in the best position to determine whether a

prosecutor's facially race-neutral explanation for a peremptory strike is genuinely

race-neutral. *Id.* Furthermore, the court of criminal appeals has "held that the reason

for a peremptory strike need not actually turn out to be correct." *Grant*, 325 S.W.3d at

660 (citing *Johnson v. State*, 68 S.W.3d 644, 649 (Tex. Crim. App. 2002)). Bowie was

struck because she was related to appellant by marriage. Thus, there is a foundation in

the record for the trial court's ruling that this explanation was not a pretext for

discrimination. *See id.*[1] In addition, the prosecutor's explanations for the remaining

strikes provided a foundation in the record for the trial court's ruling that the explanations

were not a pretext for discrimination. *See id.* The credibility of a prosecutor's

representations about his or her "information and suspicion is a matter particularly within

the trial court's province.'" *Id.* (quoting *Snyder*, 552 U.S. at 477). The correctness of the

prosecutor's "suspicion" is irrelevant. *Id.* (citing *Johnson*, 68 S.W.2d at 649). The

record before us does not demonstrate that the State's explanations of its strikes were

motivated by race. After reviewing all of the evidence in the light most favorable to the

---

[1]In *Grant v. State*, the State explained that it struck venire member Franklin because a response on Franklin's questionnaire led the State to believe that Franklin's wife knew the defendant's girlfriend. 325 S.W.3d 655, 660 (Tex. Crim. App. 2010). The trial court had before it Franklin's written answer, the record of the entire voir dire, and the two prosecutors' representations that they had certain information about the defendant's girlfriend and suspected a relationship to Franklin's wife. *Id.* The court stated, "[t]hus there was a foundation in the record for the trial court's ruling that the explanation was not a pretext for discrimination." *Id.*

14

ruling, we hold that the appellate record does not demonstrate that the trial court's denial of the *Batson* challenge was clearly erroneous. Issue three is overruled.

### III. CONCLUSION

We affirm the trial court's judgment.

ROSE VELA
Justice

Do not publish.
TEX. R. APP. P. 47.2(b).

Delivered and filed the
3rd day of February, 2011.