1654-15

NO. 04-12-00744-CR

IN THE

ORIGINAL

COURT OF CRIMINAL APPEALS

OF TEXAS

JAMES DAVIS MORRISON JR.

Appellant

FILED IN
COURT OF CRIMINAL APPEALS

DEC 30 2015

Abel Acosta, Clerk

RECEIVED IN
COURT OF CRIMINAL APPEALS

DEC 30 2015

Abel Acosta, Clerk

VS.

THE STATE OF TEXAS

Petition in Cause No. 2009-CR-7696 from
County Court-at-Law No. 379th of Bexar County, Texas,
And Appeal No. 04-12-00744-CR from the
Court of Appeals for the
Fourth Court of Appeals District of Texas

PETITION FOR DISCRETIONARY REVIEW

ORAL ARGUMENT REQUESTED

James Davis Morrison Jr
Appellant/Pro Se
#1819356 Clements Unit
9601 Spur 591
Amarillo, Texas 79107

## Identity of Parties and Counsel

Pursuant to TEX. R. APP. P. 38.1 (a)(West 2009) the parties to this suit are as follows:

(1) James Davis Morrison Jr. 9601 Spur 591, Amarillo, Texas 79107 is the appellant and was the defendant in trial court.

(2) The State of Texas, by and through the Bexar County District Attorney's Office, 300 Dolorosa St. 5th Floor, San Antonio, Texas 78205 is the appellee and prosecuted this case in the trial court.

The trial attorneys were as follows:

(1) James Davis Morrison Jr. was represented by Joel Perez, The Milam Building 115 E. Travis Street, Suite 1500, San Antonio Texas 78205 and Mark J. McKay, 405 N. St. Mary's St. Suite 1030, San Antonio, Texas 78205

(2) The State of Texas was represented by Susan D. Reed, District Attorney and Jan Ischy, Assistant District Attorney, 300 Dolorosa St. 5th Floor, San Antonio, Texas 78205.

The appellate attorneys are as follows:

(1) James Davis Morrison Jr. was represented by Lori Olenick Miller, formerly an Senior Assistant Public Defender in Bexar County, and now Attorney-at-Law, 450 Wimberly San Antonio, Texas 78221. Appellant, attorney, Lori Olenick Miller represented him in the Fourth Court of Appeals District of Texas. Appellant was also, "briefly", represented by Michael D. Robbins, formerly Assistant Public Defender, (now Senior), of Bexar County. Appellant is now Pro Se, Clements Unit, 9601 Spur 591, AMarillo, Texas 79107.

(2) The State of Texas is represented by Nicholas LaHood, District Attorney and Lauren A. Scott, Assistant District Attorney, 101 W. Nueva St. 4th Floor, San Antonio, Texas 78205-3411.

The trial judge was Honorable Ron Rangel Presiding Judge, 379th Judicial District Court, San Antonio, Texas 78205.

The Fourth Court of Appeals affirmed the trial courts judgement. The opinion written by Patricia O. Alvarez, Justice, Sitting: Karen Angelini, Justice, Sandee Bryan Marion, Justice Fourth Court of Appeals 300 Dolorosa St., 3rd floor, San Antonio, Texas 78205.

# Table of Contents

| | Page |
|---|---|
| Identities of Parties and Counsel | 2,3 |
| Table of Contents | 4 |
| Index of Authorities | 5 |
| Introduction | 6 |
| Statement Regarding Oral Argument | 6 |
| Statement of the Case | 6 |
| Statement of Procedural History | 6 |
| Grounds for Review | 7 |
| Argument | 7 |
| Prayer for Relief | XI |
| Certificate of Service | |
| Appendix | |

# Index of Authorities

## Cases

Batson v. Kentucky, 476 U.S. 79 (1986)    7, 8, 9

Purkett v. Elem, 514 U.S. 765 (1995)    8

Esteves v. State, 849 S.W. 2d 822, 824    8

Bausely, 997 S.W. 2d at 316    8

Henry v. State, 729 S.W. 2d 732 (1987)    9

DeBlanc v. State 799 S.W. 2d 701    10

TO THE COURT OF CRIMINAL APPEALS OF TEXAS:

James Davis Morrison Jr petitions the Court to review the judgement affirming his conviction for Capital Murder in Cause No. 2009-CR-7696.

## Statement Regaurding Oral Argument

The Appellant, James Davis Morrison Jr., requests oral argument before the Court of Criminal Appeals of Texas, because oral argument will assist the Court in passing on the issue of Capital Murder, is an essential element of the offense which was alleged in the charging instrument and must be proven at trial.

## Statement of the Case

The Appellant was charged by information with the felony offense of Capital Murder. He was tried and convicted by a jury, and was sentenced to life without parole. The Court of Appeals for the Fourth Court of Appeals District of Texas affirmed the judgment and sentence, on July 30, 2014 in an opinion designated for publication.

## Statement of Procedural History

A three-justice panel of the Court of Appeals rendered its opinion on July 30, 2014 Morrison v. State No. 04-12-00 744-CR. No motion for rehearing was filed.

VI

## Grounds For Review

The Fourth Court OF APPEALS failed to grant a new trial in which the trial court violated the Appellant's right to Equal Protection under the 14th Amendment to the United States Constitution, and violated Texas Code of Criminal Procedure article 35.261, when it failed to order a new jury array after the district attorney exercised a peremptory strike to exclude an African-American venire member, and did not provide a racially nuetral reason supporting the strike.

## Argument

During the course of voir dire, defense counsel lodged objections under Batson v. Kentucky, claiming that the state exercised peremptory strikes in a manner that was racially motivated. A Batson hearing followed. The trial court rejected Appellants Batson claim finding the state's exercise of a peremptory strike against the African-American venire member was "racially nuetral". The jury was eventually empanelled, and the trial ensued.

The State's purposeful use of peremptory strikes in a racially discriminatory manner violates the Equal Protection Clause of the Fourteenth Amendment to the

VII

United States Constitution as well as the Texas Code of Criminal Procedure article 35.261. Batson v. Kentucky, 476 U.S. 79 (1986). Analysis of a Batson challenge to the state's use of peremptory strikes involves a three step process. First, the defendant must make a prima facie showing that the state exercised peremptory strikes on the basis of race. Id. at 96. Once a defendant makes this showing, the State must come forward with a race-nuetral explanation for striking the jurors in question. Id. at 97. A race-neutral explanation is one that, on its face, does not deny equal protection. Purkett J. Elem, 514 U.S. 765, 769, 131 L.Ed.2d 834 (1995) (per curiam). Finally, if the State provides a race neutral explanation for its strikes, the defendant must then rebut the States explanation, show the explanation was merely a sham or pretext, or show the State exercised the strikes in a disparate manner. Esteves v. State 849 S.W. 2d 822, 824 n.2 (Tex.Crim. App.1993); Bausely 997 S.W.2d at 316. The ultimate burden of persuasion

regarding racial motivation rests with, and never shifts from the defendant. See Purkett, 514 U.S at 768. Due to the unique structure of jury selection in death penalty cases, the permissible window in which to make a challenge begins immediately after the venire member is struck and ends just before the entire jury is sworn. Id. at 582. Counsels Batson objection was timely given. Henry v. State, 729 S.W. 2d 732, 736-737 (Tex Crim. App. 1987) Counsel challenged the States use of peremptory strikes to eliminate African American venire members immediately after each of the venire persons individual voir dire. (16 BR 107). Defense counsel pointed out that the State had exercised challenges for cause on three other black individuals, being venire person #7 Aneta Villarreal; venire person #13 Bechina Estell and venire person #54 Heidi Moore. Kevin Menefee and Robert Penn had peremptory strikes used against them by the State even though they did not provide race-neutral reasons that did not

IX

display, disparate treatment. Robert Penn, when asked by the State, Can you picture yourself giving the death penalty to somebody? Penn answered I don't think I could, however you have to look at the circumstances and things like that.(23RR86) When the State asked Penn would he be able to envision a situation where he would answer the special questions in a manner that would result in the death penalty, he answered, "Maybe. Based on the evidence (23RR 88-99) Penn indicated he would want to be sure about his decision and that he would be wary of the death penalty (23RR100) Standard to be used in disqualifying prospective jurors in death penalty cases is whether their views would prevent or substantially impair performance of duties as jurors in accordance with instructions and oaths. DeBlanc v. State 799 S.W. 2d 701, Robert Penn never states that he could not follow instructions or ahere to the oath.

X

WHEREFORE, PREMISES CONSIDERED, Appellant prays that this Court reverse the Appellant's conviction and grant any other relief which may be appropriate.

Respectfully Submitted,

James Davis Morrison Jr.

James Davis Morrison Jr.

#1819356 Clements Unit

9601 Spur 591

Amarillo, TX 79107

XI



# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-12-00744-CR

James Davis **MORRISON**, Jr.,
Appellant

v.

The **STATE** of Texas,
Appellee

From the 379th Judicial District Court, Bexar County, Texas
Trial Court No. 2009CR7696
Honorable Ron Rangel, Judge Presiding

Opinion by: Patricia O. Alvarez, Justice

Sitting: Karen Angelini, Justice
Sandee Bryan Marion, Justice
Patricia O. Alvarez, Justice

Delivered and Filed: July 30, 2014

AFFIRMED

This appeal stems from Appellant James Davis Morrison, Jr.'s capital murder conviction and subsequent sentence of life imprisonment without the possibility of parole. On appeal, Morrison contends that the State exercised peremptory strikes in a discriminatory manner, in violation of his rights under the Fourteenth Amendment. U.S. CONST. AMEND. XIV; *see also* TEX. CODE CRIM. PROC. art. 35.261.

## FACTUAL BACKGROUND

Morrison was charged by indictment with capital murder by intentionally causing the death of two people in the same course of conduct. The State sought the death penalty. Morrison entered a plea of not guilty and jury selection commenced on April 17, 2012. After the jury panel was qualified, trial commenced on October 1, 2012. The jury returned a guilty verdict on October 12, 2012; and, on October 22, 2012, the trial court sentenced Morrison to a term of life in prison, without the possibility of parole, consistent with the jury's findings.

On appeal, Morrison contends the State's peremptory strikes of potential jurors, Venire No. 67 and No. 107, violated the United State Supreme Court's prohibition against the use of peremptory challenges to strike individuals based on race and his rights under the Fourteenth Amendment. U.S. CONST. AMEND. XIV; TEX. CODE CRIM. PROC. art. 35.261; *Batson v. Kentucky*, 476 U.S. 79 (1986).

## BATSON CHALLENGE

Morrison argues the trial court committed reversible error by allowing the State, in violation of *Batson v. Kentucky*, 476 U.S. 79 (1986), to use peremptory strikes to exclude Venire No. 67 and Venire No. 107 because, like Morrison, the potential jurors were African-American. The State contends it provided legitimate, race-neutral reasons to strike both potential jurors. For the reasons set forth in this opinion, we conclude Morrison did not meet his burden of persuasion under *Batson*. *See Ford v. State*, 1 S.W.3d 691, 693 (Tex. Crim. App. 1999).

### A.    Standard of Review

"[A] reviewing court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous." *Watkins v. State*, 245 S.W.3d 444, 448 (Tex. Crim. App. 2008). Because the trial court's decision

- 2 -

largely turns on its evaluation of credibility, we give the court's decision great deference and will not disturb the court's ruling unless it is clearly erroneous. *Ladd v. State*, 3 S.W.3d 547, 563 (Tex. Crim. App. 1999).

## B.   Burden Shifting

In *Batson*, the United States Supreme Court held that the State violates the Equal Protection Clause when the State excludes a venire member based on race. *Batson*, 476 U.S. at 85–86. The Court established a three-step process for evaluating *Batson* claims: (1) the defendant must make a prima facie showing of racial discrimination; (2) if the defendant makes that showing, the burden shifts to the prosecutor to articulate a race-neutral reason for the strike; and (3) the trial court must determine if the defendant has proven purposeful discrimination. *Id.* at 96–98; *Nieto v. State*, 365 S.W.3d 673, 675–76 (Tex. Crim. App. 2012); *accord Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009); *Ford*, 1 S.W.3d at 693. Although the burden shifts between the State and the defense, the burden of persuasion never shifts from the defendant. *Ford*, 1 S.W.3d at 693.

## C.   Voir Dire of Venire No. 67

In the present case, the individual voir dire questioning of Venire No. 67 continued for over two hours. Because this case turns on the potential juror's answers provided during voir dire, and the trial court's assessment of the State's race-neutral reasons for the peremptory strike, we include a detailed version of the testimony and arguments of counsel.

Early in questioning, the eighteen-year-old potential juror indicated that he had a difficult time concentrating and staying in one place for extended period of time and further averred that his ADHD, dyslexia, and epilepsy would make it difficult for him to sit on the jury. In fact, the potential juror even brought his sister to the jury selection as a "chaperone." When asked about the numerous blanks he left on his written questionnaire, Venire No. 67 acknowledged that he had a difficult time understanding the questions and that he had a hard time reading, including his own

writing. When asked by the prosecutor, Venire No. 67 affirmed that he would like to claim a student exemption.

After Venire No. 67 continued to express difficulty with the prosecutor's questions, the trial court interrupted the proceedings and asked questions of the potential juror; specifically the court inquired whether Venire No. 67 understood the document that was provided to the entire venire explaining the process in a death penalty trial. Venire No. 67 indicated that he understood the document, but when asked to explain what it meant, the court noted that Venire No. 67 sat in silence for over twelve seconds.

| | |
|---|---|
| Trial Court: | In reading this document, did you understand what it referred to when it talked about the two-phase jury trial? Do you know what that means? |
| Venire No. 67: | Yes. |
| Trial Court: | Okay. What does that mean to you? |
| Venire No. 67: | (No response) |
| Trial Court: | Just for the record, the lady is taking the record. It's been about 12 seconds or so. |
| | . . . . |
| | Do you have an understanding that every criminal trial in Texas goes in two phases, right? The first phase is a guilt/innocence phase. The second phase is we call the "punishment phase." Now, the first phase, the sole issue is did the State prove to you beyond a reasonable doubt each and every element of the charge or the indictment? Do you understand what that means? |
| Venire No. 67: | No. |
| Trial Court: | Okay. All right. Do you remember when I talked to you about the presumption of innocence a couple of weeks ago? |
| Venire No. 67: | (No response) |

The judge proceeded to re-explain the presumption of innocence and the steps taken in a bifurcated trial. The court further explained that in a capital murder case, the punishment phase would only be one of two things, life in prison or the death penalty. To each of the questions, the potential juror indicated that he understood the court's explanation. The court continued:

| | |
|---|---|
| The Court: | Okay. I'm going to backtrack a little bit, okay? I just told you that in every criminal case, there's two phases. There's a two- |

|              |                                                                                      |
|--------------|--------------------------------------------------------------------------------------|
|              | phase part to the jury—to a jury trial. Do you remember we talked about that?         |
| Venire No. 67: | Yes.                                                                               |
| The Court:   | What does that mean to you?                                                           |
| Venire No. 67: | (No response)                                                                      |
| The Court:   | And you can take your time. There's no rush. Just for the record, it's been about10-15 seconds now. |
| Venire No. 67: | I don't understand the question.                                                   |

The court attempted to ask the question a little differently:

|              |                                                                                      |
|--------------|--------------------------------------------------------------------------------------|
| The Court:   | When I told you that there was a two-phase jury trial, the first phase was the guilt/innocence phase. What would be the issue in that guilt/innocence phase that I just told you? |
| Venire No. 67: | Uh.                                                                                |
| The Court:   | And without answering this particular question, if you can, because it's been another 10 seconds or so, can you tell me what's going on in your mind right now? |
| Venire No. 67: | The right side of my head hurts.                                                   |
| The Court:   | Okay. And for the record, the lady taking the record, I note that you have your right hand pressed to your forehead as you're looking down. You look like you're going through a little bit of pain or are you just thinking? |
| Venire No. 67: | I'm thinking.                                                                      |
| The Court:   | Okay. So when you say "your head hurts," what does that mean?                         |
| Venire No. 67: | I'm really trying to remember.                                                     |
| The Court:   | Okay. And it's been probably about a minute or two since we talked about that first phase; is that about right? |
| Venire No. 67: | Yes.                                                                              |
| The Court:   | Okay. Do you remember – do you recall at all what we talked about in regards to that first phase? |
| Venire No. 67: | (No response)                                                                      |

The trial court then walked through the two part process again with Venire No. 67. When discussing the punishment section, the court read the first special question: "Is there a probability that the defendant would commit criminal acts of violence that would constitute a continuing threat to society." Venire No. 67, however, was unable to answer the court's question and confirmed that he did not "have an understanding of what's going on."

The prosecutor interjected that Venire No. 67's sister had actually helped him with the questionnaire and then re-urged her request that the court allow Venire No. 67 to use his student exemption. The defense objected.

> Defense Counsel: We would object, Your Honor. Again, that this individual stated to the Court that he attends school for one hour on Saturdays. That would not conflict with the trial, under the Government Code, first.
>
> Secondly, that under 35.16(a)(5), while he explained to the Court that he may have some difficulty understanding, he clearly told the Court that he understood what's going to happen in phase one, to find the guy guilty or innocent. And that the answers to the questions on part two would dictate either life without parole or death.
>
> I would also note for the Court that in his questionnaire, he clearly understood a lot of the questions. Probably may not be the best speller. He clearly expressed his feelings. And under Article 1 of the Texas Constitution and under the Fifth and Sixth Amendments and the Fourteenth Amendment of the U.S. Constitution, this individual has the right to serve, and my client has the right to a trial of his peers and to a fair trial.
>
> I will also note for the record that under his qualifications, [Venire No. 67] listed himself in race as black, backslash, Mexican—or M-E-X. M-E-X, I'm assuming, Your Honor, that that meant Mexican; and that for the record, my client is an African-American black male. And for all those reasons, we would object the Court sua sponte excusing him, Your Honor, under the sections of the Government—that the State mentioned.

The State continued the individual voir dire. Venire No. 67 was able to answer some questions, and to others he simply provided no response. The trial court subsequently denied the article 35.16(a)(5) challenge for cause and denied the request for an exemption. TEX. CODE CRIM. PROC. ANN. art. 35.16(a)(5) (West 2006) ("A challenge for cause may be made by either the state or the defense [if] the juror has . . . such bodily or mental defect or disease as to render the juror unfit for jury service, . . . and the court in its discretion is not satisfied that the juror is fit for jury service in that particular case.").

The State continued in questioning Venire No. 67:

State: And do you think that maybe some of the issues you're having, like the epilepsy and the ADHD, and right now you said you can't focus and you can't keep up answering questions right now, is that something that would hinder you during the trial also?

Venire No. 67: Yes.

State: And would you agree that if you're hindered during the trial and you can't focus and can't keep up with what's going on, that you can't be a fair juror to anybody; is that right?

Venire No. 67: Yes.

The State highlighted Venire No. 67's difficulty in remembering elements of the trial that were explained earlier in the questioning. The potential juror explained:

Venire No. 67: I had to empty everything out because it was starting to hurt.

State: What do you mean "you have to empty everything out"?

Venire No. 67: I had to stop remembering everything because it was starting to hurt.

State: Okay. What was starting to hurt when you had to empty everything out?

Venire No. 67: My head.

The State reurged its objection to the juror under article 35.16(a)(5). *Id.* The court again denied the request. Upon further questioning from the State, the potential juror again indicated that he did not want to sit on the jury and that he did not think he "would be of any use." The State passed the potential juror and the defense counsel asked numerous questions, many of which the juror did not answer.

At the close of the defense questions, the State exercised a peremptory strike. The court excused the juror and the defense challenged the State's peremptory strike with a *Batson* Challenge. Defense counsel stated on the record that the potential juror appeared to be African-American male and confirmed the defendant, Morrison, was also African-American. Defense counsel proceeded to identify other jurors the State used peremptory challenges on that were also African-American, and concluded that the State excluded Venire No. 67 "on the basis that he is, in fact, black."

Based on the allegations raised by the defense, the burden shifted to the State to provide a race-neutral reason for the strike. *Batson*, 476 U.S. at 96. The State argued in response:

> [T]here's nothing at all with regards to race that's at issue. The issue is the little boy that came in, [Venire No. 67], told us more than once that he's in class, he'd like to exercise his exemption. The Court denied his exemption. Even though it's just a Saturday class, one day a week, one class a week for an hour, he is in school full-time under the Government Code.
>
> He said he was in remedial classes. He reads okay, he says, but he can't write. He can't even read his own writing. In fact, there was one thing I asked him about that he had written on his questionnaire that he couldn't read. And it was actually his own writing.
>
> He has stated when he was in here that his head was hurting. He was— couldn't keep up answering all these questions. . . . [I]t was less than two hours that the State questioned him. Part of that time was when the Court was trying to explain to him what was going on. He was very clear by his facial expressions, it was very clear by his attitude that he was uncomfortable, he was having a hard time. With regards to any following of legal issues, he stated more than once that this was a situation where he felt that if someone doesn't speak up on behalf of themselves, they're probably guilty. And once I talked to him enough and he realized that the right answer should really be that he can follow the law, then he said, "Well, I can follow the law and I can just not think about that."
>
> When his sister was in the room and she started crying because of the stress she saw her brother going through . . .
>
> It's very clear, and I think the Court saw, the defense saw, everyone else saw how uncomfortable this child was when he was in here—this 18-year-old— how difficult it was for him to sit through this. There were long, long pauses when he was asked a question. When I asked him about the second prong, the mitigating circumstances, he didn't understand clearly.
>
> I had asked him about—I explained to him what capital murder cases were, giving him some examples, and about 15 minutes later, he couldn't remember. So I explained them to him again what it was, and probably three minutes later, he remembered one example, and that being the killing of more than one person.
>
> I think it was clear that he was not in a position to sit on a jury, Judge.

After listening to the individual voir dire of Venire No. 67, and the State's and Defense's arguments, the court concluded:

> [A]lthough the Court determined that [Venire No. 67] was understanding what was going on, it was a true—it was a borderline mental defect issue under Article 35.16 (a)(5).
>
> The Court erred on the side of caution, but the—but the venireperson was clearly very slow. It was clearly—it was clear to the Court that that individual venireperson was taught to basically agree with everything that was posed to him. You could see that through the questioning. It was obvious he was having a difficult time being here. And without saying much more, I don't know if I can make it any clearer than that.

The trial court concluded, "The Court finds that the State exercised a race-neutral strike."

We next look at the voir dire questioning regarding potential juror number 107.

## D.     Voir Dire of Venire No. 107

Unlike Venire No. 67, Venire No. 107 told the attorneys that he served on a criminal jury in the 1990s and the jury returned a verdict of not guilty. When questioned about the death penalty, the potential juror told the attorneys that he "would really, really, really . . . have to look at it and study it very, very closely" based on his previous experience with "racial unrest" and "individuals that were of the black community . . . who were charged with certain things that eventually they found out that hey, this is not true." In response to questions about imposing the death penalty, Venire No. 107 indicated that he could not "ever picture [himself] giving the death penalty to someone" and that he "would always vote for a life sentence [without the possibility of parole] instead of the death penalty." Upon further pressing from the State as to whether he could follow the law knowing that the defendant would be sentenced to death, Venire No. 107 answered with "I don't know," "maybe," and "possibly."

Shortly after the defense began questioning Venire No. 107, the prosecutor interrupted and informed the court that she intended to utilize a peremptory strike on the potential juror. Defense counsel responded with a *Batson* challenge noting the potential juror was African-American and had indicated on his questionnaire and in voir dire that he could follow the law.

In response, the State identified several examples, from his voir dire and his written questionnaire, when Venire No. 107 indicated his opposition to the death penalty: "[H]e would always vote for life sentence instead of the death penalty;" "[H]e was opposed to capital punishment except in few cases;" "Life imprisonment without parole is more effective than capital punishment;" "I'm not in favor of capital punishment;" "Everybody has a right to live;" and "I'm not in to putting people—a person to death." The State concluded "I don't know how much more clear it could be than that. I mean, he's borderline challengeable for cause, he's just not quite there."

After the State tendered its voir dire notes and questionnaire to the defense, the trial court denied the *Batson* challenge.

## E.    Analysis

The sole inquiry in a *Batson* challenge is whether the strike was the product of purposeful discrimination. *Watkins*, 245 S.W.3d at 447. Although the burden shifted to the State to provide a race-neutral explanation for the strike, the defense maintained the burden of persuasion. *Ford*, 1 S.W.3d at 693. Here, the record is replete with examples of why Venire No. 67 would have a difficult time serving on a capital murder jury. He had difficulty reading, writing, and understanding the issues presented during the voir dire process. Similarly, Venire No. 107 expressed repulsion to the death penalty and questioned his ability to impose a death sentence.

Viewing the record as a whole, and giving deference to the trial court's factual determinations, we conclude the trial court's rulings on Morrison's *Batson* challenges were not clearly erroneous. *Gibson v. State*, 144 S.W.3d 530, 534 (Tex. Crim. App. 2004) (explaining whether peremptory challenge is genuine "is solely a question of fact . . . [and] the trial court was in the best position to make that credibility determination."); *accord Watkins*, 245 S.W.3d at 448.

The State provided ample evidence to support reasons for striking both Venire No. 67 and Venire No. 107 were race-neutral, and nothing in the record suggests otherwise.

## CONCLUSION

Because the State's race-neutral reasons for striking Venire No. 67 and Venire No. 107 are clearly supported by the record, we cannot say the trial court erred in overruling Morrison's *Batson* challenges. Accordingly, Morrison's sole issue on appeal is overruled and we affirm the trial court's judgment.

Patricia O. Alvarez, Justice

DO NOT PUBLISH