

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

———————————————

No. 02-19-00173-CR

———————————————

KEITH DESHAUN MATHEWS, Appellant

V.

THE STATE OF TEXAS

On Appeal from the 396th District Court
Tarrant County, Texas
Trial Court No. 1579283R

Before Sudderth, C.J.; Gabriel and Bassel, JJ.
Memorandum Opinion by Chief Justice Sudderth

# MEMORANDUM OPINION

## I.  Background

Appellant Keith Deshaun Mathews appeals his convictions for aggravated assault with a deadly weapon and assault against a family or household member with a previous conviction.  *See* Tex. Penal Code Ann. §§ 22.01(b)(2)(A), .02(a)(2).  The trial court sentenced Mathews to 20 years' imprisonment on each count to run concurrently.  In one point, Mathews argues that the trial court erred by denying his *Batson* challenge to the State's peremptory strikes against veniremembers 12 and 30, who are African-American.  *See Batson v. Kentucky*, 476 U.S. 79, 89, 106 S. Ct. 1712, 1719 (1986).  Specifically, Mathews asserts that the State's proffered race-neutral reasons for striking veniremembers 12 and 30 were mere pretext for purposeful discrimination.  Because we hold that the trial court's denial of Mathews's *Batson* challenge was not clearly erroneous, we affirm.

## II.  *Batson* Challenges

The Equal Protection Clause of the Fourteenth Amendment to the United States Constitution prohibits race-based jury selection.  U.S. Const. amend. XIV, § 1; *Batson*, 476 U.S. at 89, 106 S. Ct. at 1719; *Jasper v. State*, 61 S.W.3d 413, 421 (Tex. Crim. App. 2001); *see* Tex. Code Crim. Proc. Ann. art. 35.261(a).  In the face of perceived purposeful discrimination, a defendant may request a *Batson* hearing to address the challenge.  *See* Tex. Code Crim. Proc. Ann. art. 35.261(a).

Trial courts follow a three-step process to resolve *Batson* challenges. *Snyder v. Louisiana*, 552 U.S. 472, 476–77, 128 S. Ct. 1203, 1207 (2008); *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009). First, the movant must make a prima facie case of racial discrimination. *Snyder*, 552 U.S. at 476, 128 S. Ct. at 1207; *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). Once a prima facie showing has been made, the burden of production shifts to the nonmovant to articulate a race-neutral reason for its strike.[1] *Snyder*, 552 U.S. at 476–77, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 447. Finally, if the nonmovant tenders a race-neutral explanation, the trial court must decide whether the movant has satisfied its burden of persuasion to prove purposeful racial discrimination. *Snyder*, 552 U.S. at 477, 128 S. Ct. at 1207; *Purkett*, 514 U.S. at 767–68, 115 S. Ct. at 1771; *Watkins*, 245 S.W.3d at 447. To meet this burden, the movant must prove by a preponderance of the evidence that the allegations of purposeful discrimination were true in fact and that the race-neutral reasons proffered were merely a sham or pretext. *Watkins*, 245 S.W.3d at 447, 452.

## III.    Standard of Review

On appeal, a trial court's ruling on the issue of discriminatory intent must be sustained unless it is clearly erroneous. *Snyder*, 552 U.S. at 477, 128 S. Ct. at 1207; *Watkins*, 245 S.W.3d at 448. Appellate courts must give great deference to

---

[1]At this second step, the explanation need only be race-neutral on its face. *See Watkins*, 245 S.W.3d at 447. Plausibility of the race-neutral explanation is considered only in the third step of the analysis. *Purkett v. Elem*, 514 U.S. 765, 767–68, 115 S. Ct. 1769, 1771 (1995).

credibility and demeanor determinations made by the trial court in connection with a *Batson* inquiry. *Snyder*, 552 U.S. at 477, 128 S. Ct. at 1208. As the court of criminal appeals has explained, "a reviewing court should examine a trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, with great deference, reversing only when that conclusion is, in view of the record as a whole, clearly erroneous." *Watkins*, 245 S.W.3d at 448. When determining whether a race-neutral explanation was a pretext for purposeful discrimination, we examine whether comparative evidence demonstrates disparate treatment of minority veniremembers. *See Miller–El v. Dretke*, 545 U.S. 231, 241, 125 S. Ct. 2317, 2325 (2005). Disparate treatment may be shown if the race-neutral reason for striking a minority veniremember applies equally to an otherwise similar nonminority veniremember who was not stricken. *Id.*, 125 S. Ct. at 2325.

However, we cannot automatically impute disparate treatment in every case where the reason for striking a minority veniremember also technically applies to a nonminority veniremember who was not stricken. *See Cantu v. State*, 842 S.W.2d 667, 689 (Tex. Crim. App. 1992). The decision to strike a particular potential juror is not susceptible to such rigid qualification. *Id.* We must also look to the entire record to determine if, despite a similarity, there are any significant differences between the

characteristics and responses of the veniremembers that would, under the facts of the case, justify different treatment. *See Miller–El*, 545 U.S. at 247, 125 S. Ct. at 2329.[2]

## IV. Mathews's *Batson* Challenge and Hearing

Here, after the State exercised its peremptory strikes, Mathews's counsel raised a *Batson* challenge regarding the State's striking veniremembers 12 and 30. The State concedes that Mathews satisfied his burden of establishing a prima facie case of racial discrimination (step one). The burden then shifted to the State to come forward with race-neutral explanations for its strikes (step two).

As to veniremember 12, the State proffered three reasons for its strike: (1) "she mentioned that she had severe PTSD regarding past abuse," (2) "she also talked about the sheriff at her high school using racial slurs," and (3) "her brother has been pulled over multiple times by law enforcement." Additionally, the State noted that in response to the jury-questionnaire question that asked, "Have you or someone you

---

[2]In *Miller–El*, the Supreme Court "considered the combined impact of a number of factors in concluding that, by clear and convincing evidence, the prosecutors exercised two peremptory challenges on a racially discriminatory basis, notwithstanding the race-neutral explanations they offered at the *Batson* hearing." *Watkins*, 245 S.W.3d at 448 (citing *Miller–El*, 545 U.S. at 266, 125 S. Ct. at 2340). Those factors included (1) that the State had struck a higher percentage of African-Americans than those who were not African-American, (2) that the State's reasons for striking African-American jurors appeared to apply equally to non-African-American jurors whom the State did not strike, (3) that the State had used jury shuffles in a manner that supported an inference of racial discrimination, (4) that the State had questioned African-American jurors differently from those who were not African-American and in a way designed to obtain answers justifying strikes of African-American jurors, and (5) that the county in which the defendant was prosecuted had a formal policy of excluding minority jurors from service. *Miller-El*, 545 U.S. at 240–64, 125 S. Ct. at 2325–39; *see Watkins*, 245 S.W.3d at 448–49.

know had an unpleasant experience with the police?" veniremember 12 answered "Yes" and wrote "Excessive force, Racism." These three reasons can generally be lumped into two categories—a history of domestic abuse and bad experience with law enforcement.

As to veniremember 30, the State proffered three reasons for its strike: (1) veniremember 30 had a DWI conviction, (2) he answered "three" in response to a scaled question regarding law enforcement, and (3) he liked CNN.

The reasons provided by the State as to veniremembers 12 and 30 were, on their face, race-neutral. Indeed, Mathews does not dispute this on appeal. The heart of the dispute at trial and on appeal centers on the third step—whether the race-neutral reasons offered were pretextual. On this point, Mathews bore the burden of proof. *See Watkins*, 245 S.W.3d at 451–52.

## V. Discussion

### A. Disproportionate-Strike Analysis

Because the State used two of its ten peremptory challenges (20% of its strikes) to strike 50% of the African-Americans within the strike[3] zone (two of four veniremembers), the State admits that its strikes disproportionately excluded African-American veniremembers. *See id.* at 451 (noting the State's use of 55% of peremptory strikes to exclude 88% of African-American veniremembers was clearly disproportionate); *see also Henderson v. State*, No. 02-15-00397-CR, 2017 WL 4172591,

---

[3]The strike zone ranged from veniremember 1 through veniremember 40.

at *10 (Tex. App.—Fort Worth Sept. 21, 2017, pet. ref'd) (mem. op., not designated for publication) (noting that the State used a statistically disproportionate number of strikes when it used two, or 20%, of its ten peremptory challenges to strike 67% of the African–Americans on the venire panel); *Jackson v. State*, No. 02-09-00023-CR, 2010 WL 1509692, at *5 (Tex. App.—Fort Worth Apr. 15, 2010, pet. ref'd) (mem. op., not designated for publication) (concluding that State's use of 30% of its peremptory challenges to strike 75% of African-Americans on the venire panel was statistically disproportionate). While disproportionality in the use of strikes may "support the appellant's ultimate burden of persuasion that the State's proffered race-neutral explanations are a sham," *Watkins*, 245 S.W.3d at 452, the analysis does not end there. The Supreme Court in *Miller–El* noted that a comparative analysis is "[m]ore powerful" than "bare statistics," and thus, we must also consider the State's proffered reasons for striking veniremembers 12 and 30. 545 U.S. at 241, 125 S. Ct. at 2325.

## B. Comparative-Juror Analysis

### 1. Veniremember 12

At the outset of the *Batson* hearing, Mathews's counsel challenged the first one of the two categories of race-neutral reasons given for veniremember 12 by asserting that she wanted to know which other domestic violence victims were struck on the basis of a domestic violence history. The State then clarified that veniremember 12 not only was a victim of domestic violence but also was someone suffering "complex

7

PTSD for all types due to abuse from her father." Mathews argues the State's reason was pretextual because other veniremembers spoke during voir dire of their past experiences with family violence. Mathews specifically points to veniremember 14, who was presumably not African-American[4] and was not struck despite her personal history of domestic abuse.

Comparing veniremember 12 with veniremember 14, the record shows that veniremember 12 wrote "domestic abuse" on her jury questionnaire in response to the question asking if she had been a victim of a crime. During voir dire, in response to the prosecutor's question about whether anyone had experience with domestic assault or abuse, veniremember 12 raised her hand and stated, "Mine was from my father. I have complex post-traumatic stress disorder from abuse, all types from my father for about nine years." To the prosecutor's follow-up question, "And with that experience, is that something you could set aside and determine this case only on the facts and evidence that you hear or is it something that's affected you so much that you can't give any fair judgment to the defendant," veniremember 12 responded, "I could."

---

[4]The record does not include a demographic makeup of the venire panel, but the State does not challenge Mathews's counsel's statement during the *Batson* challenge, "If they struck number 12, number 30, or number 40, we would have a *Batson* challenge on those." Thus, for purpose of analysis, we assume all other veniremembers were not African-American unless stated otherwise during the *Batson* hearing, like veniremember 5.

Veniremember 14, after asking to speak privately, also relayed to the trial court and counsel a history of domestic abuse. Hers involved abuse from her ex-husband while she was pregnant. The prosecutor then asked, "What effect is that going to have on you?" to which veniremember 14 replied,

> I honestly feel like it wouldn't have any effect whatsoever. I still believe that [it] would not have any effect. . . .
>
> And I just know that my heart rate, I mean it was up to 127. I'm like, oh, my gosh. So I just felt like, okay, maybe this is stirring a little something in me. And I just wanted to be honest about that. But like I said, I'm extremely nervous just talking right now in that situation, so that may be why.

Mathews argues that unlike veniremember 12, veniremember 14 was visibly shaken during voir dire when recounting her history of domestic abuse and yet was not struck by the State, which serves as proof of pretext. In response, the State clarifies that it struck veniremember 12 because she had experienced *both* domestic abuse *and* bad experiences with law enforcement, a characteristic not shared by veniremember 14.

As to bad experiences with law enforcement, the record indicates that veniremember 12 answered "yes" to the jury-questionnaire inquiry asking if she or someone she knew had had an unpleasant experience with the police. When prompted to describe the unpleasant experience, she wrote, "Excessive force. Racism." And when veniremember 12 was asked to explain her answer during voir dire, she stated,

9

So at the high school I went to—there was a sheriff that had his own office within our school. He was called in one day for a student who was being loud, joking, but the teacher couldn't get him to stop. So normal for a police officer to come in, kind of straighten him out a little bit. What the kid got wasn't—he didn't deserve. Pretty much slammed his face on the ground, threw him around a little bit. Knocked over desks. It wasn't anything kids should see. It wasn't anything that should be done to a child.

Veniremember 12 also added that the officer used racial slurs. When asked if that was the only bad experience she had with police, she responded, "My brothers have been pulled over multiple times. Reason being taillights out. The taillight wasn't out. But my whole family is mixed, so what some of my brothers experience, my white brothers don't experience." And when further asked if she could set those experiences aside and judge the police officers' credibility after hearing their testimony, veniremember 12 responded, "Uh-huh."

While veniremember 14 had a history of domestic abuse, she never indicated bad experiences with law enforcement. On her jury questionnaire, veniremember 14 answered that neither she nor someone that she knew had had an unpleasant experience with police. To the contrary, she indicated that others close to her had worked as police officers, writing, "Best friend is a Tarrant co. officer, boyfriend is an ex-officer, uncle ex-Lieutenant in Ft. Worth." During voir dire, when asked if she could listen to the officers' testimony before judging their credibility, she stated, "I mean, I really feel like, I mean, I want to believe that, you know, they're all good and they're here for us and all of that, but they're people." The State then repeated the

10

same question, and she replied affirmatively. Thus, veniremember 14 can be distinguished from veniremember 12 because veniremember 14 did not relate bad experiences with police, she had family and friends in law enforcement, and she expressed a belief that police are there to help citizens.

Because the record supports the State's argument that veniremember 12 noted *both* unpleasant experiences with police *and* domestic abuse, we cannot say that a comparative analysis with veniremember 14 supports Mathews's requisite burden of persuasion that the State's proffered race-neutral explanation was pretextual. *See Watkins*, 245 S.W.3d at 452.

Mathews further argues that a dozen veniremembers indicated bad experiences with police—some having more severe and personal negative experiences than veniremember 12—and points out that four other veniremembers who were not African-American[5] expressed negative experiences with police but were not struck by the State. We will examine each of these four potential jurors.

Veniremember 19, who was ultimately seated on the jury, described multiple unfair experiences with police. Following her "yes" answer to the jury-questionnaire inquiry about whether she or someone she knew had had an unpleasant experience with police, veniremember 19 wrote that her brother was pulled over for a broken taillight and was held at the location for hours awaiting a drug dog. When the State asked her if she believed that her brother was treated fairly or not, she answered,

---

[5]Mathews identified those four as veniremembers 19, 25, 27, and 37.

11

"unfairly." Similar to its questioning of veniremember 12, the State then asked veniremember 19 if that was her only bad experience with police. Veniremember 19 replied that there was another incident involving her daughter that she described as having been "handled horribly." When asked if she could put aside those experiences and make judgments on credibility only after the evidence had been presented, veniremember 19 replied, "I would do my best, but that would certainly impact my assessment." But when further pressed for a "yes or no" answer, veniremember 19 answered, "Yes."

As for veniremember 25, who was also seated on the jury, he also answered "yes" to the question regarding unpleasant experiences with police. When asked to describe the experience, he wrote: "terrible attitudes and hateful." When the State asked him to explain his answer he stated, "When you're trying to be polite with them, and they—they're just impolite, brash." But when asked if he believed this of all officers, he answered, "No, certainly not." Like veniremember 12, when veniremember 25 was asked if he could put aside those experiences, he replied, "Oh, yeah."

On veniremember 27's jury questionnaire asking about negative experiences with police, she wrote, "Good friend's daughter was arrested for outstanding traffic warrant. The policeman treated her like a [word omitted from the record]."[6] When asked to elaborate during voir dire, she said this incident led her to believe that "that

---

[6]Veniremember 27's jury questionnaire appears to be incomplete.

12

particular officer" was "kind of over the top for the situation. But, you know, I think it was just him." The State did not ask veniremember 27 if she could set those experiences aside but rather moved on to ask further questions of another veniremember who had indicated bad experience with police.

Regarding veniremember 37, he indicated on his jury questionnaire that he had had no unpleasant experiences with police. And during voir dire, veniremember 37 provided no additional information about encounters with law enforcement.[7] He also did not indicate any history of domestic abuse on his jury questionnaire and did not raise his hand to add any additional information when the prosecutor raised the topic. And neither the State nor Mathews questioned him on this topic.

While the record supports Mathews's claims of disparate treatment as to bad experiences with police, none of the four veniremembers—19, 25, 27, or 37— indicated that they had any history of domestic abuse. Veniremember 12 was the only potential juror to note *both* negative experiences with law enforcement *and* a history of domestic abuse. The State argued that it struck veniremember 12 based on the totality of her negative experiences with police, from high school to her brothers' treatment, coupled with her history of family violence. Because the trial court's ruling requires "an evaluation of the credibility and demeanor of prosecutors and venire members [sic], and because this evaluation lies peculiarly within the trial court's province," we must defer to the trial court "in the absence of exceptional

---

[7]Neither the State nor Mathews questioned him on this topic.

circumstances." *Grant v. State*, 325 S.W.3d 655, 657 (Tex. Crim. App. 2010). No exceptional circumstances are present here, and the trial judge found credible the State's explanation of why, despite some similarities between veniremember 12 and veniremembers 19, 25, 27, and 37, different treatment was justified. Thus, we do not disturb that finding on appeal. *See id.*

### 2. Veniremember 30

The State explained that it struck African-American veniremember 30 because of his DWI conviction, because he answered "three" in response to a scaled question regarding law enforcement,[8] and because he liked CNN. During the *Batson* hearing, the State pointed out that it had also struck veniremember 2, a white male who had a marijuana conviction.[9] But Mathews's attorney countered that another veniremember with a completed felony deferred adjudication was seated on the jury[10] and added that the State failed to ask veniremember 30 follow-up questions regarding his DWI conviction.

---

[8]During voir dire, the prosecutor posed a question regarding "the local police here in Tarrant County" by asking veniremembers to rank their attitudes on a scale of one to five, with one meaning "you're not at all satisfied" and five meaning "you're completely satisfied."

[9]We assume that veniremember 2 was a white male from the prosecutor's statement during the *Batson* hearing, "We did strike juror number two who did have a marijuana conviction, who is a white male."

[10]Veniremember 10, presumably not African-American, served on Mathews's jury despite his 1995 deferred adjudication for unlawful possession of a firearm.

14

On appeal, Mathews raises three arguments suggesting the State's race-neutral reasons for striking veniremember 30 were a pretext for a racially motivated strike.

First, Mathews argues, as he did during the *Batson* hearing, that the State's proffered reason regarding veniremember 30's misdemeanor DWI conviction is mere pretext because the State did not strike veniremember 10, who had been on felony deferred adjudication. While a conviction serves as a race-neutral reason for exercising a peremptory strike against an individual, *see Henderson*, 2017 WL 4172591, at *11, the record here indicates veniremember 10 had no conviction because he had successfully completed deferred adjudication, and the State argues that this provides a significant distinction between veniremembers 30 and 10. *See id.* The record supports the State's argument because it reflects that the State struck the only two veniremembers with convictions—veniremembers 30 and 2. Thus, under a comparative analysis, we cannot say that Mathews's conviction argument, at least by itself, compels a determination that the trial court clearly erred.

Second, Mathews asserts that three other potential jurors—who are presumably not African-American—also answered "three" to the State's scaled question but were not struck by the State. The State concedes that it did not strike these three veniremembers—5, 8, and 19—but argues that none of these veniremembers also had a conviction, unlike veniremember 30. As the State argued regarding veniremember 12, it was not the "three" answer alone, but a combination of veniremember 30's conviction and his "three" answer that motivated the State's strike. Thus, in the

15

absence of exceptional circumstances, we once again defer to the trial court's ruling on the credibility of the State's argument that the differences between veniremember 30 and veniremembers 5, 8, and 19 justified different treatment.

## C. Disparate Questioning

Mathews also raises a disparate-questioning argument.

### 1. Disparate Questioning Between Veniremembers 12 and 37

During voir dire, the prosecutor discussed two main topics. First, drawing on the questionnaire responses, he asked which veniremembers had had bad experiences with police. Next, the prosecutor sought to determine which of the veniremembers had been victims of domestic abuse.[11] Additionally, during the course of voir dire, the prosecutor asked the entire panel, "Does anybody know anyone who has been falsely accused of a crime, or more specifically, of domestic violence?"

Citing *Miller-El,* Mathews argues the State engaged in disparate questioning when it did not strike veniremember 37, who recounted familiarity with a falsely accused individual and answered the scaled question posed by the prosecutor "the exact same way" ("three" on a scale of one-to-five) as both veniremembers 12 and 30, who were struck. To begin, the record does not support Mathews's claim that veniremember 37 answered "three" to the scaled question on police. Rather, it shows

[11]The prosecutor asked this question at large and then sought elaboration when a history had been indicated on the jury questionnaire. For example, veniremember 12 wrote "domestic abuse" in response to the jury-questionnaire question asking if she had been a victim of a crime, so the prosecutor followed up with questioning of veniremember 12 during voir dire.

16

that he answered "four," indicating stronger support for police than veniremembers 12 and 30.

Second, the subject of false accusations was not among the race-neutral reasons proffered by the State for its strikes, and veniremember 37 never indicated that he had any unpleasant experiences with police or a history of domestic abuse. More importantly, when the State asked the entire panel about false accusations, veniremember 37 was the only veniremember in the strike zone who responded.[12] Because neither veniremember 12 nor 30 raised their hands to the question, there was no reason for the State to question them on this topic. Thus, there is no evidence of disparate questioning.

### 2. Lack of Meaningful Questioning of Veniremember 30

Additionally, also citing *Miller-El*, Mathews contends that the State engaged in disparate questioning by not engaging in meaningful voir dire with veniremember 30. Specifically, Mathews argues that the prosecutor failed to ask veniremember 30 any questions on the topics the State claims were its race-neutral reasons for striking

---

[12]When the State asked the entire panel, "Does anybody know anyone who has been falsely accused of a crime, or more specifically, of domestic violence?" veniremember 37 was the only potential juror in the strike zone to raise his hand. He stated that his friend's family was accused "of all sorts of terrible things" by the Department of Homeland Security and that he believed the accusations were inaccurate. When the State asked if that experience would taint his judgment, veniremember 37 stated, "No, I don't think so. I mean, it just showed that people could do things like that, but it wouldn't taint me." After being asked if he could wait to hear all the facts before making a determination on whether the State met all elements, he replied, "Absolutely."

him—his conviction, his answering "three" to the scaled question, and his indication that he watched CNN.

The Supreme Court indicated in *Miller–El* that the State's failure to engage in meaningful voir dire with a veniremember who the State strikes is evidence suggesting that the strike is discriminatory. 545 U.S. at 246, 125 S. Ct. at 2328. But the Supreme Court also stated that appellate courts must review the propriety of the trial court's ruling on a *Batson* challenge based on the "totality of the relevant facts" about the State's conduct during the trial. *Id.* at 239–40, 125 S. Ct. at 2324–25.

First, regarding Mathews's claim that the prosecutor failed to ask questions concerning veniremember 30's conviction, the prosecutor did not ask veniremember 2—the only other potential juror with a final conviction and who was also struck by the State—any questions regarding his conviction either.[13] Since the State did not further question another similarly situated veniremember who was not African-American, we cannot say that the State engaged in disparate questioning by failing to ask additional questions of veniremember 30 related to his DWI conviction.

Second, as to veniremember 30's answer of "three" to the scaled question, Mathews points to no other veniremember who was asked follow-up questions as to a "three" answer, and we find none. And, as the State points out, veniremember 30 never raised his hand or offered additional information. The record also shows that

_____

[13]On appeal, the State additionally argues that the prosecutor could have decided not to ask additional questions about his conviction simply to save time, a strategy that the State contends is reasonable.

18

the State did not further question four other (presumably non-African-American) veniremembers—18, 29, 31, and 38—who only responded to the scaled question and were subsequently struck. Thus, on this record it does not appear the prosecutor's treatment of veniremember 30 was disparate by failing to engage in meaningful voir dire on his response to the scaled question regarding law enforcement.

Finally, as to the lack of questioning regarding veniremember 30's jury questionnaire response that he liked CNN, no other potential jurors listed CNN on their jury questionnaires. And the State posed no additional questions to any veniremembers during voir dire related to their answers regarding news or television preferences. Thus, the State's lack of questioning of veniremember 30 as to his CNN preference provides no evidence of disparate treatment.

### D. Other Factors

The remaining *Miller-El* factors support the trial court's ruling. Neither the State nor Mathews utilized a jury shuffle, and there is no evidence in the record that Tarrant County has a formal policy of excluding minority jurors from service. *See Henderson*, 2017 WL 4172591, at *11. In fact, it appears that one African-American—veniremember 5—was seated on the jury.[14] These remaining factors support the trial court's decision. *See id.* (citing *Lee v. State*, 949 S.W.2d 848, 851 (Tex. App.—Austin

---

[14]We assume that veniremember 5 is African-American because during the *Batson* hearing, the prosecutor noted that "juror number five is an African-American that was not struck by the State," and the accuracy of this statement was not refuted in the trial court or on appeal.

1997, pet. ref'd) ("[W]e note the State did not strike the other African-American juror in the strike zone. This bolsters the prosecutor's statement that he did not strike [a veniremember] because of race.")).

## VI.    Conclusion

Reviewing the record as a whole and applying, as we must, great deference to the trial court's ruling, we cannot say that the trial court was clearly erroneous in overruling Mathews's *Batson* challenge. *See Watkins*, 245 S.W.3d at 448. Although the statistical analysis demonstrates that the State used a disproportionate number of peremptory strikes on African-Americans, the reasons proffered for the strikes were race neutral, and our comparative analysis of veniremembers 12 and 30 provides support for the trial court's failing to find that the State's reasons for striking them were pretextual. *See id.* at 448, 453–54. Accordingly, we overrule Mathews's single point and affirm the trial court's denial of Mathews's *Batson* challenge.

/s/ Bonnie Sudderth
Bonnie Sudderth
Chief Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 3, 2020

20